1                   UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    UNITED STATES OF AMERICA,          )
                                        )
5         Plaintiff,                    )  No. 20-CR-2923-LAB
                                        )
6              v.                       )  August 24, 2021
                                        )
7    JAHVARIS LAMOUN SPRINGFIELD,       )  2:19 p.m.
                                        )
8         Defendant.                    )  San Diego, California
     _____ )
9

10    TRANSCRIPT OF JURY TRIAL - DAY 1 - EXCERPT OF LEVINE TESTIMONY
                   BEFORE THE HONORABLE LARRY ALAN BURNS
11                     UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:      UNITED STATES ATTORNEYS OFFICE
                             By:  STEPHEN H. WONG, ESQ.
14                                MIKAELA LAUREN WEBER, ESQ.
                             880 Front Street
15                           San Diego, California  92101

16   For the Defendant:      LAW OFFICE OF MATTHEW C. BINNINGER APC
                             By:  MATTHEW C. BINNINGER, ESQ.
17                           225 Broadway, Suite 2100
                             San Diego, California  92101-5030
18

19
     Court Reporter:         CYNTHIA R. OTT, RDR, CRR
20                           District Court Clerk's Office
                             333 West Broadway, Suite 420
21                           San Diego, California, 92101
                             cynthia_ott@casd.uscourts.gov
22

23

24

25   Reported by Stenotype, Transcribed by Computer

1                              I N D E X

2   <u>EXAMINATIONS</u>                                      <u>PAGE</u>

3   MICHAEL LEVINE, M.D...................................
    DIRECT EXAMINATION BY MR. WONG....................    3
4   CROSS-EXAMINATION BY MR. BINNINGER................   47
    REDIRECT EXAMINATION BY MR. WONG..................   88
5

6

7                          E X H I B I T S

8                                                        <u>PAGE</u>

9   Government's Exhibit 201 was received in evidence...  20

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          SAN DIEGO, CALIFORNIA, AUGUST 24, 2021, 2:19 P.M.

2                              * * * *

3          (Beginning of Excerpt.)

4          MS. WEBER:  Your Honor, at this time, the United

5    States calls Dr. Michael Levine.

6          THE COURT:  Doctor, come forward, please.  You can

7    stop there and raise your right hand.

8          MICHAEL LEVINE, M.D., GOVERNMENT'S WITNESS, SWORN

9          THE COURT:  All right.  Have a seat and adjust the mic

10   as close as possible to your mouth.  Keep your voice up.  State

11   and spell your full name.

12         THE WITNESS:  Michael Levine, M-I-C-H-A-E-L, Levine,

13   L-E-V-I-N-E.

14         THE COURT:  All right.  And when you testify, a little

15   slower.

16         Go ahead, Mr. Wong.

17                       DIRECT EXAMINATION

18   BY MR. WONG:

19   Q.  Dr. Levine, where are you employed?

20   A.  The University of California at Los Angeles.

21   Q.  And what do you do for a living?

22   A.  I'm a physician.

23   Q.  What kind of physician?

24   A.  Emergency medicine and medical toxicology.

25   Q.  Are you also a professor?

1    A.   Associate professor.

2    Q.   And where do you teach?

3    A.   UCLA.

4    Q.   UCLA Medical School?

5    A.   Correct.

6    Q.   Are you also -- do you participate on any national boards?

7    A.   Multiple.

8    Q.   Do you participate in a nationwide poison control advisory

9    board?

10   A.   Yes, sir.

11   Q.   And what do you do for that board, what are your duties?

12   A.   It's called the MPDS Fatality Review Committee.  So what

13   that is, is it's a -- every year, they take a constellation of

14   all the deaths reported to U.S. Poison Control Centers, and go

15   through the deaths and ascribe causality.

16   Q.   And you participate on that board and ascribe causality to

17   multiple events that come through a Poison Control Center?

18   A.   Correct.

19   Q.   What is toxicology?

20   A.   Toxicology is -- is a medical specialty that evaluates

21   overdose, envenomations, and adverse drug reactions.

22   Q.   Now, you are a medical toxicologist?

23   A.   Yes, sir.

24   Q.   How is that -- how is your job different from that of a

25   pharmacist?

1    A.   So a pharmacist doesn't have any specific medical training.

2    It's an entirely different schooling.  And a pharmacist focuses

3    on medications, and specifically legal prescription

4    medications, and then knows all about the pharmacology and the

5    chemistry of those medications.

6    Q.   And those are drugs given at therapeutic doses?

7    A.   Correct.

8    Q.   And in contrast to that, what do you, as a medical

9    toxicologist, study?

10   A.   So I also study adverse drug reactions, but from a -- much

11   more from a clinical standpoint.  And I also focus on what

12   happens in overdose phenomena, not just at therapeutic dosing,

13   but in supratherapeutic dosing.

14   Q.   What is a pathologist?

15   A.   A pathologist is a physician that is trained, that

16   has -- that completes -- so they complete medical school.  And

17   they undergo a residency, where they focus on several different

18   things.  Mostly on tissues, and on bodies, and on lab

19   abnormalities.

20        So depending on if it's a clinical versus anatomical

21   pathologist, one focuses more on the lab side, one focuses more

22   on the body and tissue side.

23   Q.   How is your specialty different from a pathologist?

24   A.   So multiple ways.  So in medical toxicology, it's a

25   two-year fellowship training specifically on drugs and

1    chemicals and adverse reactions.

2        A pathologist is focusing on all causes of death.  So I

3    focus more on living patients, a pathologist focuses

4    exclusively on dead patients.  And a pathologist's overall

5    training in toxicology is much more limited than mine.

6    Q.  And in contrast, your training is more specialized into

7    poisonings?

8    A.  Correct.

9    Q.  And do you have -- does that include drug overdoses within

10   poisonings?

11   A.  Yes, sir.

12   Q.  And, sir, I can -- I can tell, because I'm looking past the

13   court reporter.  You have a natural tendency to speak rather

14   quickly.  And it looks like that's going to be challenging, so

15   I'll ask you to slow it down a little bit.

16   A.  Sorry.  Please remind me again if I'm speaking too fast.

17   Q.  Sure.  Could you explain what you were asked to do in

18   connection with this case?

19   A.  I was asked by the U.S. Attorneys Office and the DEA to

20   evaluate the -- the documents and the death, and figure out

21   what the but-forth cause of death was in this case.

22   Q.  Before we get to your opinions, let me go a little bit

23   further into your training and experience.  What education did

24   you undertake to get where you are today?

25   A.  So I have an undergraduate degree from the University of

```
 1   Southern California, or USC.  It's a bachelor's degree.
 2       After that, I went to Chicago Medical School, and got my
 3   medical degree.  Following that, I went to -- I moved to
 4   Boston, and I went to the Harvard Affiliated emergency medicine
 5   residency, where I completed a four-year residency.
 6   Q.  And what was that residency in?
 7   A.  Emergency medicine.  And then --
 8   Q.  And you were elected to a leadership position during that
 9   time, correct?
10   A.  Correct.  I served in -- in my last year, I served as one
11   of the chief residents.
12   Q.  And that's a position that you're elected to, to sort of
13   take a leadership role over the other residents?
14           MR. BINNINGER:  Objection, Your Honor, leading.
15           THE COURT:  No, it's a preliminary matter.
16           You may answer, Doctor.
17           THE WITNESS:  That's correct.
18   BY MR. WONG:
19   Q.  And what did you do after your residency?
20   A.  I moved to Phoenix, Arizona, and I completed my medical
21   toxicology fellowship.
22   Q.  Now, how is that different from the residency you had just
23   done?
24   A.  So medical toxicology is a subspecialty of emergency
25   medicine.  So emergency medicine is a four-year residency
```

1    program, where you go through all of emergency medicine.  You

2    learn how to take care of anyone who comes into the emergency

3    department.

4        Poisonings or overdoses are a component of that, but a

5    relatively small component, because patients come into the

6    emergency department with any number of complaints.

7        The medical toxicology fellowship was two years, just

8    focusing on overdoses, and envenomations, and adverse drug

9    reactions.

10   Q.  And in total, including bachelor's degree, medical school,

11   residency, and fellowship, how many years of -- could you add

12   it all up for us?

13   A.  It's the three and a half years for undergrad, four years

14   for medical school, four years for residency, and then two

15   years for fellowship.

16   Q.  What board certifications do you currently hold?

17   A.  I'm board certified in both emergency medicine and medical

18   toxicology.

19   Q.  And what does it mean to be board certified?

20   A.  So board certification is after successfully completing a

21   residency or a fellowship, you have to take a series of exams.

22   You have to take a series of exams, and successfully pass the

23   exams to demonstrate expertise in that field.

24   Q.  About how many people, physicians, are board certified in

25   medical toxicology in the United States?

```
 1    A.   My guess is around 400, but I don't have an exact number.

 2    Q.   And that's across the entire country?

 3    A.   Correct.

 4    Q.   Could you describe the evolution of your work in emergency

 5    rooms over the years?  What varied positions have you held in

 6    the ER?

 7    A.   So a long time ago, I was -- I was an -- going back to high

 8    school, I was a volunteer.  Then I was an EMT, and I worked as

 9    an ER tech.  And then I -- after medical school, I did my

10    emergency medicine residency.

11         Following residency and following completion of all my

12    training, I stayed on as faculty in Arizona for a year, before

13    moving to USC.  And I was faculty at USC for nine years.  The

14    last about five years, I was chief of the Division of Medical

15    Toxicology there.  And then a year-and-a-half ago, I moved to

16    UCLA.

17    Q.   And do you do the current -- and you currently do that

18    at -- you work as an emergency room teaching doctor at UCLA

19    Medical School?

20    A.   That's correct.

21    Q.   And you also work at other emergency rooms throughout Los

22    Angeles County?

23    A.   Correct.

24    Q.   Have you conducted research on the toxicological effects of

25    controlled substances?
```

```
 1   A.   Multiple studies.
 2   Q.   Can you provide a few examples of past and present research
 3   studies you have undertaken that are related to the opinions
 4   you're going to provide in this case?
 5   A.   Sure.  So one study that's -- it's ongoing, but we just had
 6   the preliminary data or the abstract accepted at a conference
 7   is looking at adulterants in patients who are presenting with
 8   opiate overdoses.  And looking at what other drugs are actually
 9   in there, compared to what the patient thinks they do.  And
10   that's part of a federally funded multicenter study.
11       I have a couple different studies that have looked at
12   naloxone, which is an antidote for opiate overdoses
13   administered in the field or by pre-hospital personnel.
14   Q.   About how many studies have you published or been part of a
15   team that published in peer-reviewed medical journals?
16   A.   Somewhere between 80 to 90 papers in peer-reviewed medical
17   journals.
18   Q.   And could you tell us what peer reviewed means?
19   A.   Yeah, so a peer-reviewed article or a journal is when you
20   submit your -- you write-up your study, you submit it to the
21   journal.  And then the journal is going to send it out to
22   three, four, five, it depends on the journal, other people that
23   it may consider experts in the field.
24       And those experts will then say either, A, the study has
25   merit, or, B, it doesn't.  And then we'll also go ahead and
```

1   look at the paper, and we'll provide constructive criticisms.

2   Sometimes it may be small changes.  Sometimes it may be large

3   methodological problems, like you need to redo the analysis

4   looking at it from this way.

5       And then if you make the changes, then usually, but not

6   always, the paper will get accepted.  So that's the peer-review

7   process.

8   Q.   Could you describe a typical day, if there is one, in your

9   current job as an emergency room doctor, what sorts of cases do

10  you encounter today?

11  A.   So really everything could come into the emergency

12  department.  There is no typical day.  It could be patients

13  that come in -- I will see overdose patients.  I'll see

14  patients coming in with chest pain.  I'll see patients coming

15  in with traumatic injuries, whether it's a car accident or a

16  gunshot.  I could see little kids coming in with fevers.  I

17  could see any number of -- basically, anything that anyone

18  feels is an emergency, and shows up to an emergency department,

19  I will see.

20  Q.   And you're trained to address all of those different

21  maladies?

22  A.   Correct.

23  Q.   What is a toxidrome?

24  A.   A toxidrome is a pattern, or a specific pattern of toxicity

25  that one would see following a class of overdose.  So, for

1    example, if you're talking about opiate overdose, it's the

2    combination of mental status depression, or being really,

3    really sleepy or obtunded, respiratory depression, so not

4    breathing as well, and pinpoint pupils, meaning the pupils are

5    really, really tiny.

6        That combination or that toxidrome, or that combination of

7    those three things, the CNS or central nervous system

8    depression, respiratory depression, and the myosis or pinpoint

9    pupils is considered an opiate toxidrome.  So almost all

10   opiates could do that.  So it doesn't matter per se, does

11   someone take X opiate versus Y opiate with regards to

12   recognizing that pattern.  And that's what a toxidrome is, is a

13   pattern of -- a pattern for the clinician to recognize that

14   would be suggestive of a specific class of drugs.

15   Q.  Okay.  How many -- and I'll ask you just to give us a broad

16   range, because we're just trying to lay a foundation for the

17   opinions you're going to express.

18       Provide a broad estimate of the number of controlled

19   substance or drug-induced toxidromes, and I'm talking about

20   street drugs, such cases you've encountered in your career?

21   A.  I'm sorry.  Are you asking for the number of cases or the

22   number of different toxidrome?

23   Q.  The number of cases.

24   A.  Thousands.  I don't have an exact number.

25   Q.  When you are presented with a potential toxicology case in

1   the ER, what methodology do you use to narrow the sources of

2   causation, and try and figure out what's going on.  Do you have

3   a methodology you consistently apply as an emergency room

4   doctor?

5   A.  I do.  So I look at -- first of all, I take a history.  I

6   figure out what -- what -- if the patient says what they took,

7   obviously, I take that certainly highly into consideration.

8        But often they don't, or often they're incorrect on what

9   they took.  So I look at what the patient reports.  I look for

10  collaborating information, whether that's what are all the

11  other pills in that house, what other medications might they

12  have access to, what are old prescriptions that have been

13  written for.

14       So I look for other collaborating information.  I look

15  at -- I perform a physical exam.  And I look at various things

16  on the exam, including the vital signs, their pupillary size,

17  their overall mental status, and how they're behaving.  I look

18  at their skin findings.  I look at all sorts of -- their muscle

19  tone.  All sorts of different things.  And then we'll order

20  ancillary tests, which often include various blood tests, and

21  an EKG.

22  Q.  Those are lab results?

23  A.  Correct.

24  Q.  And you look at those lab results?

25  A.  I do.  And then I synthesize all of that together to come

1   up with a likely cause and then treatment plan.

2   Q.   Now, Dr. Levine, when we asked you to consult with, and

3   ultimately -- consult with my office, and ultimately testify in

4   this case, you are being compensated for your time; is that

5   right?

6   A.   Yes, sir.

7   Q.   At what rate?

8   A.   For reviewing documents, for preparing reports, I'm -- I

9   charge $350 an hour.  And then for trial, 600 an hour.

10  Q.   Could you -- now, does --

11        MR. WONG:  Your Honor, at this point, I'd ask

12  permission to proceed under Rule 702.

13        THE COURT:  Do you have any voir dire questions of the

14  doctor?  The prosecutor wants to elicit from him opinion

15  questions.  I find he's credentialed at this point, but I'm

16  happy to hear if you have any voir dire.

17        MR. BINNINGER:  No.

18        THE COURT:  All right.  The Court finds that

19  Dr. Levine has the experience, training, and education that

20  qualifies him to give opinions on the subject of medical

21  toxicology.

22        Go ahead.

23  BY MR. WONG:

24  Q.   When you are evaluating a case such as this, trying to

25  determine the cause of death, what is the process you go

1    through?   What methodology do you apply?

2    A.   So I look at kind of a similar overall methodology.   So I

3    will look at any type of information that was obtained or

4    provided to me prior to -- and what the decedent was doing

5    prior to being found dead.

6        I'll look at the autopsy reports.   And I don't personally

7    conduct the autopsies, but I rely on the pathologist's report,

8    in terms of any anatomical abnormalities that were found.

9        I'll look at the drug levels.   I'll look at the conditions,

10   in terms of anything that might alter the drug levels.   And

11   then I'll look at how the drug levels are consistent or not

12   consistent with what the decedent was doing prior to -- or how

13   they were behaving prior to their death.

14       And then I will make a -- make a report to figure out and

15   summarize my findings.

16   Q.   Okay.   And you did that in this case?

17   A.   Yes, sir.

18   Q.   Now, before I go to your findings, could you explain what

19   is your understanding, when you use the term but-for cause of

20   death, what is that?

21   A.   Yeah, so but-forth cause of death is what is the immediate

22   or the proximate cause of death, meaning if it were not there,

23   would that person have died?

24       So, for example, if I have a patient that is a -- has

25   cancer, and they're on chemotherapy, and they develop some

```
 1   life-threatening infection because they're very, very

 2   immunosuppressed from the chemo, wipes out their immune system,

 3   the but-forth cause of death would be that bacterial infection.

 4   It's not the cancer.

 5       So even though they wouldn't have gotten the chemotherapy

 6   if it weren't for the cancer, and they wouldn't be

 7   immunosuppressed, the but-forth cause of death in that would be

 8   their septic shock, or their infection that caused them to die.

 9       So that's what I view as the but-forth cause of death, is

10   what is the immediate proximate cause of death that if that

11   were not there, would the person still have died.  And if they

12   would have died, then that's it.  If they would not have died

13   for it, it's not the but-forth cause of death.

14   Q.  And that's different from a contributing factor -- a

15   contributing cause of death?

16   A.  Correct.  So in that example that I gave you, cancer may be

17   a contributing cause of death, but the but-forth cause of death

18   would be their infection.

19   Q.  Okay.  And there are also other factors that you might

20   think are in the universe of -- of things that affect a person,

21   but are irrelevant to the cause of death?

22   A.  I'm sorry, could you state that slightly differently,

23   please?

24   Q.  Sure.  In your hypothetical example, if the cancer patient

25   was also morbidly obese, would you deem that, in your example,
```

1  irrelevant to their death?

2  A.   That would likely be either irrelevant or possibly

3  contributory, but most likely irrelevant, because they were the

4  same weight a week before as they are the day they died,

5  presumably.

6       And that they didn't die a week before, they died the day

7  they died.  So the weight doesn't change.  That's not the

8  but-forth cause of death.

9  Q.   And, again, this sounds very similar to the methodology you

10 just described, when you described your work as an emergency

11 room physician.

12 A.   Correct.  It's essentially the same general methodology.

13 Obviously, the specifics are modified, but the general

14 methodology and how I approach it is the same.

15 Q.   Okay.  Now let me jump to the end right now, and then we'll

16 back into how you arrived here.

17      What is your -- in your opinion, what was the cause of

18 Mr. Gallagher's death?

19 A.   Acute fentanyl toxicity.

20 Q.   Do you believe cocaine was a causative factor in his death?

21 A.   Not at all.

22 Q.   So let's see how you arrived at that opinion.

23      What did you first review when you were reviewing Brendan

24 Gallagher's death?

25 A.   I don't remember the specific order, but I could tell you

1    the general set of documents that I received.

2    Q.   That's fair.

3    A.   I received some documentation outlining where they --

4    how -- it was all redacted, but some general documentation

5    about the overall investigation, and how they found the

6    substances, how they found pills.

7        I looked at the -- I got the autopsy report.  I got the

8    investigation report from the local police department and the

9    DEA.

10       I got the DEA's lab -- the DEA lab report, in terms of the

11   analysis of the pills.  And then I conducted -- after that, I

12   then conducted also some independent review, where I relook at

13   the levels, and how those relate to other deaths, just to make

14   sure I'm not incorrectly recalling things.

15   Q.   You reviewed the medical examiner's toxicology report.  Is

16   that one of the documents you included when you referenced

17   medical examiner documents?

18   A.   It was.  I apologize.  I was assuming -- I was lumping that

19   all together with the autopsy.

20   Q.   Okay.  What -- now, among all those things, could you give

21   us or describe the facts that you found most salient for your

22   analysis, the facts upon which -- the main facts upon which you

23   based your conclusion?

24   A.   I think several things.  So the fact that Mr. Gallagher

25   was -- seemed to be alive and doing relatively well shortly

1  before his death, that he was awake and alert, and presumably

2  relatively communicative, because he was having texting

3  conversations about purchasing drugs.

4     He was seen by a witness that was then sitting there

5  outside smoking a cigarette, and appeared to be relatively calm

6  and just sitting there smoking.  And then within an hour, he

7  was found unresponsive and dead.

8     I think those are all relevant pieces of information for

9  some of the background parts.  In terms of the -- from the lab

10  reports and the medical examiner's report.

11  Q.  Yes, sir.

12  A.  The fact that there was nothing else identifiable found on

13  his autopsy.  And then the fact that there was -- the fentanyl

14  level is certainly in a range that's consistent with

15  fatalities.  And there was no actual cocaine found in his body.

16  Q.  Okay.  Now, there was no actual cocaine, there was

17  benzoylecgonine found?

18  A.  Correct.  That's a cocaine metabolite.  So when you have

19  cocaine, cocaine gets broken down via multiple different

20  mechanisms.

21     There's two main products that are formed.  One is ecgonine

22  methyl ester, and one is benzoylecgonine.  And there are

23  multiple smaller metabolites as well.

24     So we have evidence that he had used cocaine, because we

25  see the metabolites of it, but we don't have the actual parent

1  compound drug, where the cocaine was not found.

2  Q.  Now, I'm going to back up for a second, so that we can see

3  the toxicology report that you just described, so that we can

4  follow along with you.

5      Could you please turn to tab 201 in the binder to your

6  right?

7  A.  Is that volume 1 or 2?

8  Q.  Volume 1, tab 201.

9  A.  Okay.

10  Q.  And could you tell us what is Exhibit 201?

11  A.  It's labeled as County of San Diego Medical Examiner's

12  Department Toxicology Report.

13  Q.  And is this the toxicology report that you -- was it

14  -- that you relied on in forming your opinion about the cause

15  of Mr. Gallagher's death?

16  A.  Yes, sir.

17  Q.  And do the --

18        MR. WONG:  Well, at this point, I would move to

19  introduce Exhibit 201.

20        MR. BINNINGER:  No objection.

21        THE COURT:  All right.  201 is received without

22  objection.

23      (Government's Exhibit 201 was received in evidence.)

24  BY MR. WONG:

25  Q.  So in a second, it will appear on your screen.  And I'll

1    ask my paralegal, Ms. Jennifer Braun, to enlarge that, so we

2    can see it, if possible.

3        Very well.

4        Dr. Levine, could you walk us through this report, and tell

5    us what you see that was important to you.  And if we need to

6    move the report or look at the bottom half, let us know and

7    we'll move it.

8    A.  Sure.  So the top -- the top little part is alcohol

9    analysis, GC/FID.  And that just refers to the method that they

10   used to analyze.  So it's gas chromatography/flame ionization

11   detection.  And that's a fancy way of saying what they did.

12   And they found that there was no alcohol or acetone isopropyl,

13   which is a rubbing alcohol, or methanol, which is commonly

14   referred to as, like, wood alcohol or moonshine, none of that

15   was found.

16       The next section is what's called drug of abuse screen,

17   which is -- where it says, ELISA.  And that, more or less, is

18   like -- it's a quick screening for various classes of drugs.

19   And it's almost like a pregnancy test, where it comes back as

20   like a plus, minus, two bars, one bar.  It depends on the

21   specific screen that you're using, but that's just a general

22   quick screen.

23       So it says, amphetamines, benzodiazepines, buprenorphine,

24   carisoprodol, methadone, opiates, oxycodone, phencyclidine, or

25   PCP, and zolpidem, which is Ambien, none detected.

1        And then where it says cannabinoids, cocaine metabolites,

2   and fentanyl, presumptive positive.

3        What that presumptive positive means is on these screens,

4   there could be false positives or false negatives, so that's

5   why it says presumptive positive.  It's not a confirmatory

6   test.

7        If you go down further, where it says, base screen, GC-MS,

8   benzoylecgonine, and then cocaine metabolites via GC-MS.  GC-MS

9   is gas chromatography mass spectroscopy.  And that is a

10  confirmatory test.  That's going to give, like, a fingerprint

11  for every single drug that exists has a specific pattern that's

12  recognized on GC-MS.  So it has a specific molecular weight,

13  and it has a specific -- meaning the drug weighs a certain

14  amount.  And it has a specific -- what's called retention time,

15  meaning when they heat up whatever the substance is, it comes

16  off at a certain degree and certain temperature.

17       And that computer analyzes what number of seconds it came

18  off in the column on.  So for example, 37.245 seconds at 68

19  degrees centigrade, with a molecular weight of whatever.  And

20  they would say, that's drug X.

21  Q.   Okay.

22  A.   There's not more than one drug that's going to have that

23  specific properties, so that's a confirmatory test.

24  Q.   And what substances did that test identify in

25  Mr. Gallagher?

1    A.   It identified benzoylecgonine, which is a cocaine

2    metabolite.  It identified -- I'm sorry, it identified

3    benzoylecgonine, which is a cocaine metabolite.  And it did not

4    identify cocaine or cocaethylene.  It also identified fentanyl.

5    Q.   Okay.

6    A.   And then it identified some fentanyl metabolites

7    underneath, which are -- I'm sorry, that's under

8    nonbiologicals.  It identified fentanyl.

9    Q.   Okay.  Now, before we go deeper into the fentanyl and the

10   benzoylecgonine, did you look at the autopsy report to rule out

11   certain other potential causes of sudden death in 26-year-old

12   Mr. Gallagher?

13   A.   Multiple.

14   Q.   Okay.  What did you consider before you went to

15   toxicological causes?

16   A.   I'm saying that first, in a 26-year-old, would be to look

17   for traumatic injuries is probably the most common thing.  And

18   there weren't any traumatic injuries found.

19        When you're looking at other causes, you would look at --

20   it's just kind of going through by systems.  So in the brain,

21   you could look at, was there any evidence of head bleeding, was

22   there any evidence of swelling in the brain, was there any

23   evidence of the brain being pushed from like a tumor or

24   bleeding or something.  That's called herniation.  And there

25   was none of that found.

```
 1    Q.   Did you look for signs of a seizure?

 2    A.   The pathologist --

 3    Q.   I'm sorry, let me retract that.  I misspoke.  Did the

 4    pathologist look for signs of a seizure, and did you find

 5    those -- the pathologist report significant in that respect?

 6    A.   So you won't necessarily see definitive signs of a seizure

 7    on an autopsy.  You could see secondary findings.  You could

 8    see like a tongue bite mark, like people often bite their

 9    tongue when they're having a seizure.  You could see evidence

10    of incontinence.  You could see other things, or you could see

11    something that's structurally abnormal that caused the seizure.

12         Whether it's a tumor, whether it's some blood in the brain,

13    whether it's an infection.  You could see any number of things

14    that might cause a seizure.  And none of those secondary things

15    were found.

16    Q.   So you ruled out seizure in that way?

17    A.   I think it's unlikely that he had a seizure, certainly a

18    seizure that caused his death.

19    Q.   Okay.  Did you look -- and to do that, you looked at the

20    pathologist's notes regarding the brain tissue?

21    A.   Correct.  And they were described as being normal.

22    Q.   Did you look for evidence of a heart issue?

23    A.   I did.  So there were multiple issues that were looked at,

24    one of which is sometimes, for example, if people use cocaine,

25    or they have other diseases, like lupus, a young person like a
```

1   20-year-old or a 30-year-old, could get bad atherosclerosis,

2   which is hardening of the arteries.  It's generally very

3   uncommon in a 20-year-old to have an actual, quote, unquote,

4   heart attack, which is a blockage of the artery.  But the

5   pathologist looked for that, and didn't see any evidence of

6   that.  And the coronary arteries were described as being quite

7   clear.

8        They took tissue samples of the heart, and they looked at

9   those.  And those were all normal.  They didn't see any

10  evidence of signs of a heart attack.  They didn't see any

11  evidence of inflammation of the heart.  And then when I -- at

12  one point, I had asked you to specifically go back and relook

13  and make sure there wasn't other findings, something called

14  contraction band necrosis, and there wasn't.

15  Q.  Okay.

16  A.  And that's a pattern that could be seen with

17  cocaine-induced heart injury.

18  Q.  Did you note the condition of the pulmonary arteries?

19  A.  Those were patent, meaning they were widely open.  So there

20  was no big blood clot in his lungs.

21  Q.  And, again, did you look at the terminal bronchials?

22  A.  The pathologist did, and those were -- those were not

23  suggestive of a specific pathology.

24  Q.  Or did you look for other signs of some obstructive lung

25  disease?

1    A.   There were no findings, per the pathologist, of obstructive

2    lung diseases.

3    Q.   So based on your review of that part of the report, what

4    conclusions did you draw regarding Mr. Gallagher's potential

5    traumatic or natural causes?

6    A.   That, along with the rest of the exam, made me determine

7    that I didn't see any signs of a natural cause of death or of a

8    traumatic death.

9    Q.   Then you turned to potential toxicological causes; is that

10   correct?

11   A.   Correct.

12   Q.   And that's what you described as the controlled substances

13   that you noted in Mr. Gallagher's blood?

14   A.   Correct.

15   Q.   And that brings us up to Exhibit 201, where there is

16   fentanyl and cocaine metabolites.

17       How is cocaine metabolized in the body?

18   A.   Cocaine is metabolized via a couple different routes.  So

19   the first -- the two largest is there's -- you could have

20   what's called hydrolysis, which is basically you break open

21   part of the ring.  And that forms the -- that forms one

22   metabolite.  And then there's specific enzymes that are also

23   going to break down the drug.  And there's two main metabolites

24   that you find, which are benzoylecgonine and ecgonine methyl

25   ester.  There's multiple other trivial or very small

 1   metabolites that are formed, like norcocaine and

 2   benzoylecgonine methyl -- ethyl ester.  There's other ones as

 3   well.

 4       But those are the primary -- the benzoylecgonine and the

 5   ecgonine methyl ester are the two primary metabolites.

 6   Q.  All right.

 7           MR. WONG:  Could we see Exhibit 201 up again?

 8   BY MR. WONG:

 9   Q.  Now, when you see cocaine changing into benzoylecgonine --

10           MR. WONG:  And if we could focus on the cocaine

11   metabolites in the fentanyl section.  Yes, right there.

12   BY MR. WONG:

13   Q.  Does cocaine break down into benzoylecgonine at a known and

14   predictable rate?

15   A.  Relatively -- yes, no, and relatively predictable.  So

16   there's a small variation, but it's within, on average, just

17   over an hour is the half-life of cocaine.

18   Q.  Okay.  Is it well established -- is the amount of time it

19   takes cocaine to completely break down, such that it's no

20   longer detectable in the body an established sort of knowledge

21   in your field?

22   A.  Yes.

23   Q.  How long does it take cocaine to transform into its

24   metabolite, benzoylecgonine, such that only the metabolite is

25   found and no cocaine is found?

```
 1    A.   The half-life is a little over one hour for the parent

 2    compound, cocaine.  So when I say parent compound, I'm

 3    referring to cocaine, not the metabolites.  So that half-life

 4    is just over an hour.  And what a half-life refers to is the

 5    time it takes for that drug concentration to be cut by 50

 6    percent.

 7         So in general, in toxicology, we refer to five half-lives

 8    as the amount of time before a drug is not going to be

 9    detectable.

10    Q.   Okay.

11    A.   So it would be around -- a little over -- close to six

12    hours or so, before I would expect to see no -- actual cocaine,

13    but simply cocaine metabolites.

14    Q.   And is that what you see here?

15    A.   That is what I see.

16    Q.   And from that, are you able to render an opinion as to how

17    long before his death Mr. Gallagher consumed cocaine?

18    A.   More than several hours.  Probably at least five or six

19    hours would be a reasonable guess.

20    Q.   Okay.

21    A.   Or estimate.

22    Q.   And at the underside of that, can you say with some medical

23    certainty that it was at least five hours before he consumed

24    the cocaine?

25         If I twisted that word, please help me to express it in a
```

1   way that makes sense to you.

2   A.   I could say that I'm comfortable saying that it was at

3   least -- that he used cocaine at least five hours prior to his

4   death.   Is that what you're asking?

5   Q.   Yes.   And, again, that means the cocaine turns into the

6   cocaine metabolite?

7   A.   Correct.

8   Q.   In the toxicology report, we have the metabolite, but we

9   have no parent compound cocaine?

10  A.   That's correct.

11  Q.   Therefore, you draw the conclusion that it was at least

12  five hours before he consumed the cocaine, before he died?

13  A.   I draw it was at least five hours from -- that he used

14  cocaine at least five hours prior to his death.

15  Q.   Okay.   Why -- and the amount of benzoylecgonine, what is

16  the amount in the toxicology report?

17  A.   0.08 milligrams per liter.

18  Q.   Could you describe the relative strength of that compared

19  to other cocaine-induced cases you have observed?

20  A.   It's very low.

21  Q.   And are you able to derive from that, that the -- either

22  the cocaine had been there longer than that, or it was a

23  relatively low amount of cocaine?

24  A.   I can't tell you which of the two, but probably one of the

25  two.

1   Q.   It was one -- one or the other of those?

2   A.   Or both, yes, sir.

3   Q.   Explain, why is that?  Help me with the logic.

4   A.   So if cocaine gets broken down to these two main

5   metabolites, even if you have some condition that's going to be

6   resulting in a slightly faster degradation of the cocaine,

7   there's -- you would expect the metabolites to be at a higher

8   amount.

9        So even if I'm converting really fast for some reason that

10  cocaine to the metabolites, breaking down that cocaine, I'm

11  going to expect to see a high amount of the metabolites.  The

12  half-life, so that time that it takes for the drug to be cut in

13  half, for benzoylecgonine is much longer than it is for

14  cocaine.  We're talking four, five, six hours half-life.

15  There's a range for benzoylecgonine, whereas we're talking just

16  over an hour for cocaine.

17       So I would expect, if he used like a normal amount of

18  cocaine, like an average dose of cocaine, if you will, I would

19  expect there to be cocaine found, if he used it really quickly

20  before his death.  And then if he used it hours prior, I would

21  expect there to be still more benzoylecgonine found.

22       And when you look at series of cocaine deaths, on

23  postmortem examples or postmortem samples, meaning when you're

24  looking at blood from dead bodies, where the cause of death is

25  cocaine, you often see cocaine levels in the 6 or 7 or 800

1    range.

2       We're seeing none.  And then the benzoylecgonine would be

3    expected to be high as well, in the hundreds, not .08.

4    Q.   Okay.

5    A.   Or the tens to hundreds, depending on --

6    Q.   And that is -- so that is a relatively low amount compared

7    to the -- when put in the context of other typical cocaine

8    cases that you have seen?

9    A.   Where cocaine is the death, correct.

10   Q.   Where cocaine is the death, yes.

11      So let's go a little deeper into why you are able to

12   exclude or on what basis you exclude cocaine as playing any

13   role in Mr. Gallagher's death.

14   A.   So I think there's a couple of reasons, one of which is we

15   talked about the levels.  But in the very beginning, I talked

16   about what is the person doing prior -- one of the things I

17   look at is what was the decedent doing prior to their death.

18      So when someone has -- when someone is high on cocaine, and

19   certainly to the point that they're going to have a fatality

20   from the cocaine, I would expect that they're not going to be

21   sitting there nicely calmly smoking a cigarette.  They're going

22   to be agitated.

23      Patients that are high on cocaine are agitated, they're

24   sweaty, they're -- often you'll find abnormal vital signs.

25   Now, we don't know what his were in this case, but they often

1   have a high heart rate, high blood pressure.

2       Really everything goes up with cocaine.  So your mental

3   status goes up.  You're hypervigilant.  You're paranoid.

4   You're hallucinating.  You're agitated.  So you could have --

5   maybe you'll have a seizure, but you'll have some increased

6   mental status.

7       You'll be not typically sitting there nice and calm, and

8   just sitting there smoking -- like you're smoking a cigarette,

9   or just smoking a cigarette, and then die from cocaine a little

10  bit later.

11  Q.  Is it true that most cocaine-related deaths occur while

12  someone is under the influence of cocaine?

13  A.  Correct.  So there was -- if you look at, for example,

14  cocaine-induced heart attacks, the risk is about 24 times

15  greater of dying in that first hour compared to subsequent

16  hours.

17  Q.  Okay.  What other -- you mentioned a heart attack.  What

18  other ways can cocaine induce sudden death?

19  A.  It could cause what's caused an aortic dissection, where it

20  tears open part of your aorta.  And you physically get a hole

21  in the aorta, which is the large blood vessel leaving the

22  heart.

23      It could cause hemorrhage into your brain and bleeding in

24  your brain.  And that could cause swelling and bleeding and

25  ultimate death.  It could cause some lung abnormalities that

1    you could see, which is not usually going to be an imminent

2    sudden death.   That's a little bit more subacute death.

3        But the quick ones are either going to be things like a

4    heart attack, some type of arrhythmia, some type of aortic

5    dissection, a head bleed, or some traumatic injury, like you're

6    agitated and paranoid, and running around doing odd things.

7    And you run off a building, or you do something like that,

8    because you're acting bizarre.

9    Q.   Now, all of those things you mentioned, are they all most

10   likely to occur while you're under the influence of cocaine?

11   A.   Correct.

12   Q.   As opposed to hours later?

13   A.   Yes, sir.

14   Q.   So why is it that you would not expect someone to consume

15   cocaine, and then hours later suffer an aortic dissection that

16   you described?

17   A.   So one of the things that happens with an aortic dissection

18   is it's usually in some individual that's predisposed, but they

19   have a thin wall.   The aorta is a little bit thin.

20       And then when you have cocaine, like I said before,

21   everything goes up.   So your heart rate goes up, your blood

22   pressure goes up.   You're really increasing that pressure

23   inside of the artery.

24       So now you have a lot higher pressure all of a sudden being

25   directed at a weak part of your aorta.   And it physically

```
 1   causes a hole to form in the aorta.
 2   Q.  Now, isn't it true that cocaine can cause an enlargement of
 3   the heart?
 4   A.  Yes, sir.
 5   Q.  And an enlargement of the heart --
 6   A.  I'm sorry, let me clarify.  Chronic cocaine, not single use
 7   cocaine.
 8   Q.  Chronically using cocaine can cause an enlargement of the
 9   heart?
10   A.  Correct.
11   Q.  What -- how does an enlarged heart contribute to sudden
12   death?
13   A.  When your heart gets very enlarged -- well, there's two
14   factors at play here.  One of which is, why is your heart
15   enlarged.  A lot of patients have an enlarged heart because of
16   an underlying disease process.
17        Like they have atherosclerotic disease.  They've had -- and
18   it ends up causing an enlargement of the heart.  Some people
19   have enlargement of the heart without underlying disease
20   processes.  So there is an increased risk of sudden death with
21   an enlarged heart.  A lot of that is related to the underlying
22   disease process that they have.  Even without it, though, there
23   still is a small increased risk of sudden death by having an
24   arrhythmia or an abnormal heartbeat.
25   Q.  And would you expect those, an arrhythmia based on an
```

1    enlarged heart, to also occur contemporaneous with or

2    relatively soon after consumption of the cocaine?

3    A.   I would expect it to be much more likely, correct.

4    Q.   Why is that?

5    A.   Because cocaine does a couple things, one of which is, in

6    addition to things like raising your heart rate and your blood

7    pressure, it messes up what's called sodium channels in your

8    heart, or throughout your body, but in your heart as well.  And

9    that sodium channel is responsible for some of the electrical

10   activity of your heart.

11       So think of it almost as -- so here's my heart.  There's a

12   little pacemaker here, and it sends electrical impulses, like

13   to the middle of the heart.  And that spreads out over the rest

14   of the heart.

15       And once that electricity goes there, it tells the heart to

16   beat.  That's why the top part beats slightly before the bottom

17   part.

18       The cocaine is going to -- and when you have high doses, it

19   will cause sodium channel blockade, which will mess up that

20   electrical impulse flow, and could cause arrhythmias.  But

21   that's going to be in high doses.  And the higher the dose is

22   going to be shortly after being used, not hours after you've

23   metabolized the drug.

24   Q.   Okay.  And with regard to all of those factors you just

25   listed, all the things you just described about the way an

1    enlarged heart can cause sudden death, and the way cocaine can

2    cause sudden death, does your conclusion that Mr. Gallagher

3    died at least five hours after consuming cocaine allow you to

4    rule those out?

5    A.   Yes, sir.

6    Q.   Because he had to be alive to metabolize that cocaine; is

7    that correct?

8    A.   Correct.

9    Q.   Now, why is it that cocaine could not have been metabolized

10   after he died while he was laying in the morgue, before they

11   took the blood.  They were -- I'll ask you to assume that there

12   was about 18 hours while he was sitting in the morgue before

13   his blood was drawn.

14   A.   Well, for starters, I believe he was refrigerated in the

15   morgue.  So when you're refrigerated, the body temperature

16   becomes much cooler.  And the stability of cocaine in cool

17   environments, meaning when it's, like, 4 or 5 degrees

18   centigrade, so it's just like 40-ish degrees, it lasts a lot

19   longer.  It doesn't break down very quickly.  If you have room

20   temperature, in 24 hours or so, yes, you would break it all

21   down.  But he's not at room temperature.  He's in a

22   refrigerator.

23   Q.   And why -- is there another reason, in addition to that,

24   why a person who is deceased and not breathing, why that body

25   would not metabolize cocaine?

1    A.   There is.  So when you have -- so as we said before,

2    cocaine is broken down via two main routes.  One is what's

3    called hydrolysis, where it's -- the ring of the cocaine gets

4    physically broken open.  And the other is you have some enzymes

5    that are breaking down the cocaine.

6         The enzymes are proteins.  And proteins are very, very

7    picky.  They don't like to work when you're -- and outside of

8    typical ranges.  So when you become really acidic or your pH

9    falls, which happens when you're dead, because you're not

10   metabolizing, you're not bringing new oxygen, the cells aren't

11   going to be metabolizing, the pH falls, the enzymes don't like

12   to work.

13        So they're not going to be breaking down the drug when you

14   have a really, really acidic environment.  So it's still

15   relatively -- so while you can certainly break down cocaine

16   after you die, the pH is going to be somewhat relevant as well

17   for helping that breakdown process, and those enzymes work.

18   Q.   Okay.  Now, sir, it is true that it is possible, isn't it,

19   for someone with an enlarged heart to have an arrythmia for no

20   apparent reason, not under the influence of cocaine, and just

21   have an arrythmia and die suddenly, is that correct, that it's

22   possible?

23   A.   Yes, sir.

24   Q.   Have you studied the relative occurrence of that phenomenon

25   in the American male population?

```
 1   A.   I haven't personally studied, but I've read about it.

 2   Q.   Yes, that's -- have you -- are you familiar with studies of

 3   that phenomenon?

 4   A.   Correct.  So patients with enlarged hearts have a -- again,

 5   you have to figure out why is the heart enlarged.  Is the heart

 6   enlarged because they have some underlying disease or is the

 7   heart enlarged for -- just because it's enlarged, like maybe

 8   they used cocaine or some other stimulant all the time.

 9        So patients who have an enlarged heart, in general, are a

10   decent amount of the population.  In some series, 20, 30

11   percent of the population are walking around with enlarged

12   hearts, and they're not all dropping dead.

13        So it's a couple percent risk per year, so it's clearly

14   higher than those who do not have an enlarged heart, but it's

15   by no means a guarantee that you're going to die today, or

16   tomorrow, or next month, or even within a year.

17   Q.   Basically, because there are a lot of American men who have

18   enlarged hearts?

19   A.   Correct.  Obesity, for example, is one reason why people

20   have enlarged hearts.  There's a lot of obese people in the

21   world.

22   Q.   Okay.  And there is not a lot of people who are dying

23   suddenly without any other apparent cause that is later

24   attributed to enlarged heart?

25        MR. BINNINGER:  Objection, Your Honor, leading.
```

```
 1              THE COURT:  Sustained.
 2    BY MR. WONG:
 3    Q.  Let me rephrase.  What do the studies say about the
 4    percentage of occurrence of this phenomenon?
 5              MR. BINNINGER:  Objection, Your Honor, leading.
 6              THE COURT:  No.  But it's not clear to me, you're
 7    asking him to recite studies.  Do these things factor into the
 8    opinions you've expressed?
 9              THE WITNESS:  It factors into the likelihood of having
10    an arrhythmia from having an enlarged heart.
11              THE COURT:  All right.  Rephrase your question, then.
12    He's not allowed just to recite studies.  They have to tie into
13    the basis for his opinion, Mr. Wong.
14    BY MR. WONG:
15    Q.  Now, we've gone through, and you have ruled out the ways an
16    enlarged heart can lead to death under the influence of
17    cocaine.  Now I'm asking you to render an opinion about the
18    likelihood that an otherwise healthy 26-year-old dies because
19    of an enlarged heart, for no other apparent reason.
20        Do you -- are you familiar with studies that can help you
21    provide an answer to that?
22    A.  Yes.  It's uncommon.
23    Q.  Okay.  How uncommon is it?
24    A.  Single digit, percentage-wise.  Most obese 26-year-olds
25    don't suddenly die.
```

```
1              MR. BINNINGER:  Objection, Your Honor, no question
2     pending.
3              THE COURT:  I'll let the answer stand.  Next question.
4     BY MR. WONG:
5     Q.  So based on that discussion of the approximately last 15
6     minutes, what conclusion were you able to draw with regard to
7     the -- how did cocaine factor into Mr. Gallagher's death?
8     A.  It didn't.
9     Q.  And could you tell us why?
10             MR. BINNINGER:  Objection, Your Honor, asked and
11    answered.
12             THE COURT:  Sustained.  He's answered the question.
13    Next question.
14    BY MR. WONG:
15    Q.  So after ruling out cocaine, what did you believe -- why do
16    you -- what is the cause of Mr. Gallagher's death?
17    A.  Acute fentanyl toxicity.
18    Q.  How does fentanyl -- what is fentanyl?
19    A.  It's a narcotic.  It's an opiate.  Very specifically, it's
20    an opioid.  So it's a drug that binds to a type of receptor
21    that works very, very similar to heroin, or morphine, or other
22    type of other opiates or opioids.
23    Q.  And how does it -- what effect does it have on the brain?
24    A.  It will cause what's caused CNS or mental -- or central
25    nervous system depression, meaning it will make everything shut
```

1  down.

2  Q.  Do you see factors in your review of the history -- in

3  Mr. Gallagher's history in the hour prior to his death that are

4  consistent with a death caused by fentanyl?

5  A.   Typically --

6            MR. BINNINGER:  Objection, Your Honor, vague.

7            THE COURT:  Overruled.  Do you understand the

8  question?  He's asking if, peculiar to Mr. Gallagher, you

9  see -- you saw anything that indicated death by fentanyl within

10  the last hour that he was alive.

11            THE WITNESS:  I'm sorry, could I answer that question

12  or no?

13            THE COURT:  Yeah, sure.  Do you need clarification?

14            THE WITNESS:  No, I think I understand.  I just wanted

15  to make sure I'm allowed to answer the question.

16            THE COURT:  Yes, please.  That's the question.

17            THE WITNESS:  Thank you.  So opiates generally cause a

18  relatively quick death.  So the fact that he was alive and

19  acting normal smoking a cigarette on the porch an hour before,

20  and then suddenly is dead is certainly consistent with that.

21  BY MR. WONG:

22  Q.  Opiates cause -- how quickly will fentanyl act on the body

23  to cause death?  How quickly after consumption?

24  A.  It depends on the route.

25  Q.  Could you explain?

1 A. So if I shoot a drug, like, say I take IV fentanyl or some

2 other drug, and I shoot it into my vein, I'm going to have

3 the -- the highest percent of concentration in my vein

4 immediately, because I just put it all in my vein.

5  If I take it orally, if I swallow it, I'm going to have to

6 absorb it first.  So before that drug goes into my bloodstream,

7 it's going to have to get from my mouth down to my stomach, get

8 absorbed in either my stomach or my small intestine, depending

9 on the drug.  And then the levels are going to go up, but they

10 go up a little bit slower, because you don't absorb it all

11 instantaneously, unlike shooting, where it's essentially all in

12 your vein instantaneously.

13  So if I shot it, I would expect your maximum effects to be

14 seconds to minutes.  That's why we see people dead with needles

15 still in their arms.  It's within a minute, they're dead.

16  If you take it via pill, you have -- again, that's a slower

17 process.  That process is 15, 20, 30 minutes, if not even a

18 little longer.

19 Q. What if a pill is turned into a powder and consumed

20 nasally?

21 A. If you crush it and snort it, it will behave relatively

22 close to IV, but not exactly.  It's certainly much closer to IV

23 than oral, but it's still not as fast as IV, but it's pretty

24 quick.

25 Q. And is that because it does not have to go through the

1    gastrointestinal tract?

2    A.   You skip the liver -- I'm sorry, you skip the stomach,

3    correct.  You skip some of the -- what's called first pass

4    metabolism in the liver.  You're getting -- you're absorbing it

5    across the veins, and the venous plexi in the nose relatively

6    quickly.  So you're going to get it absorbed nearly as fast in

7    the vein as if you shot it in your veins, but not quite as

8    fast, because you still have to absorb it across the nasal

9    mucosa.

10   Q.   Now, in his peripheral blood -- and by the way, could you

11   tell us what peripheral blood is?

12   A.   Yes.  So when you're talking about blood, blood from, like,

13   an autopsy, they could either stick a needle in the heart and

14   draw from your heart or your aorta.  And that's central blood.

15   Or they could draw from your arm or your leg.  Sometimes

16   they'll stick, like, a needle in the femoral vein or the

17   femoral artery, and draw it from there.  And that's peripheral

18   blood.

19        So basically, from here to here is central.  From anywhere

20   other than here to here is peripheral.

21   Q.   And you are -- just so that the transcript is accurate,

22   you're describing your torso as being central, and anywhere

23   else as being peripheral?

24   A.   Correct.  Chest and abdomen being central.  And then arms,

25   legs, peripheral.

```
 1   Q.  How much fentanyl -- what concentration of fentanyl did
 2   Mr. Gallagher have in his peripheral blood?
 3           MR. BINNINGER:  Objection, Your Honor, asked and
 4   answered.
 5           THE COURT:  No, overruled.  You may answer.
 6           THE WITNESS:  6.1 nanograms per milliliter.
 7   BY MR. WONG:
 8   Q.  What is your opinion of the relative -- that relative
 9   concentration, what role did that quantity play in your
10   opinion?
11   A.  That's -- so when I -- whenever I do a case like this, I
12   look at, obviously, everything else that we discussed before.
13   But then I look at that level, and I look at it, how it relates
14   to fatalities reported in the literature.  And that's certainly
15   in the range of levels that you would find in the literature.
16   Q.  What is a therapeutic dose of fentanyl?
17   A.  I'm sorry, a therapeutic dose or therapeutic concentration?
18   Q.  Excuse me, therapeutic concentration of fentanyl.
19   A.  Well under 1.
20   Q.  1 nanogram per milliliter?
21   A.  Much less than 1 nanogram per milliliter.
22   Q.  So this is at least six times that?
23   A.  More than that, yes, sir.
24   Q.  When you prepared your opinion in this case, did you find
25   significant a study of 112 fentanyl-related deaths?
```

```
 1   A.   I did.

 2   Q.   Could you describe that study?

 3   A.   May I please see my report to further elaborate on that?

 4   Q.   Sure.

 5   A.   Just to remind me of the specific study.

 6   Q.   Could you describe how that factored into your opinion?

 7   A.   Yeah, so what that study looked at is, it looked at --

 8   again, it looked at 112 people who died of fentanyl -- fentanyl

 9   overdoses.  And then when you're looking at the levels that

10   were seen, the levels are a little bit lower, overall, if they

11   didn't use intravenous injection, whereas it was higher if they

12   did shoot up, or if they did use intravenous injection.  And

13   this level is consistent with levels that were reported for

14   both -- for fentanyl deaths.

15   Q.   Okay.  And so what is your opinion of the cause, the

16   but-for cause of Mr. Gallagher's death?

17   A.   My opinion is that --

18            MR. BINNINGER:  Objection, Your Honor, asked and

19   answered.

20            THE COURT:  Sustained.  He's answered that.  You have,

21   haven't you, Doctor?

22            THE WITNESS:  I believe so, yes, sir.

23            THE COURT:  Yeah.

24            MR. WONG:  May I just confirm and clarify that it --

25            THE COURT:  He's answered it, Mr. Wong.  Ask something
```

1    new.

2    BY MR. WONG:

3    Q.  Sir, have you, in your experience as an emergency room

4    physician, encountered subjects who -- or patients who consume

5    an opiate that was not the intended opiate?

6    A.  Frequently.

7    Q.  And have you encountered drugs that were manufactured to

8    be -- to mimic opiates that were manufactured outside of

9    traditional pharmaceutical processes?

10   A.  Frequently.

11   Q.  And what have you found with regard to those illicitly

12   manufactured opiates?

13          MR. BINNINGER:  Objection as to foundation.

14          THE COURT:  No, overruled.  He says he has experience

15   with that.  You may answer.

16          THE WITNESS:  So, for example, as I alluded earlier,

17   I'm -- UCLA is one of a study site that's looking at, like,

18   seven or eight different centers throughout the country, that

19   are looking at patients who come in with opiate overdoses.  And

20   one of the things that we ask -- that we look at is what did

21   the patient think they took.  And then we're taking the blood

22   and sending it to a reference lab, who doesn't know what the

23   patient took, and then is going -- and it sends us the analysis

24   back.

25          And very frequently, it's going to be a drug that they

1    did not think they were taking.  And in Southern -- or UCLA, at

2    least in that part of Southern California, it's almost

3    exclusively fentanyl.  So even when patients think they took

4    heroin, they're taking fentanyl, or if patients think they're

5    taking oxycodone, it's fentanyl, or at least fentanyl is in

6    there.

7    Q.  And have you encountered -- in your practice, have you

8    encountered many patients who experience an opioid toxidrome

9    because of the counterfeit pills you just described?

10   A.  Correct.

11   Q.  Now, without asking you to repeat the opinions you've

12   described, can I ask you to ascribe the degree of medical

13   certainty you can attach to those opinions?

14   A.  I'm highly certain that cocaine was not the cause of death,

15   and fentanyl was the acute cause of death.

16            MR. WONG:  Thank you.  No further questions.

17            THE COURT:  Cross-examination?

18            MR. BINNINGER:  Yes, Your Honor.  Thank you.

19                      CROSS-EXAMINATION

20   BY MR. BINNINGER:

21   Q.  Good afternoon, Dr. Levine.

22   A.  Good afternoon.

23   Q.  I'd like to talk to you a little bit about the timeline of

24   your involvement in this case.

25   A.  Yes, sir.

1    Q.   So it's correct that you were contacted by the government

2    for your expertise in March of 2020; is that right?

3    A.   I believe it was around March of 2020.  I'll have to look

4    at my report for the exact date, but it was on or around March.

5    Q.   Sound about right?

6    A.   Yes, sir.

7    Q.   Okay.  And you prepared a report in connection with your

8    findings, right?

9    A.   Yes, sir.

10   Q.   And you prepared that in September of 2020?

11   A.   Around then.  I don't recall the exact date.

12   Q.   Okay.  And then you prepared an amended report this month?

13   A.   Correct.

14   Q.   Why did you do that?

15   A.   Because I was told that you were going to be asking

16   specific questions about two other references.  And I wanted to

17   include those -- I looked over those additional references that

18   you were going to -- I was told you were going to be asking

19   about.

20   Q.   Okay.

21   A.   And I put that in my report as additional things that I've

22   read as related to this.

23   Q.   Okay.  I'd like to talk to you really quick about those two

24   sources.

25   A.   Yes, sir.

```
 1   Q.  Is one of them Principles of Forensic Toxicology, Fifth

 2   Edition, by Barry Levine and Sarah Kerrigan?

 3   A.  Yes, sir.

 4   Q.  Did you have an opportunity to review this textbook?

 5   A.  I reviewed the parts relevant to cocaine.  I didn't read

 6   the whole textbook.

 7   Q.  That's fair enough.

 8   A.  The parts relevant to cocaine and fentanyl, yes.

 9   Q.  And would you agree that this is a reliable source in the

10   field of toxicology?

11   A.  Yes, sir.

12   Q.  And then also did you read -- and you know that that

13   chapter that was written on cocaine was written by David

14   Isenschmid [as spoken], correct?

15   A.  I believe it was.  He was one of the authors I recall.

16   Q.  And he was one of the authors that drafted the report that

17   I asked you to read, correct?

18   A.  Yes, sir.

19   Q.  And that report -- or excuse me, study was a comprehensive

20   study of the stability of cocaine and its metabolites?

21   A.  Yes, sir.

22   Q.  Okay.  All right.  So let's talk a little bit about what

23   you were asked to do, and what you wanted to review before you

24   made any report, okay?

25       So you knew that you were going to be writing a report
```

1    about a cause of death in connection with a federal case,

2    correct?

3    A.   I didn't know it was going to be specifically writing a

4    report.  I was asked to review it, and then to give my opinions

5    first, and likely write a report.

6    Q.   Okay.  But you knew that your expertise was being sought

7    out in connection with a federal criminal case involving

8    distribution of fentanyl resulting in death?

9    A.   I learned that somewhere around that time, correct.

10   Q.   Okay.

11   A.   I don't remember the exact details as when I learned that

12   it was a federal prosecution or a state prosecution, or details

13   specifically about it.

14   Q.   Fair enough.  But fair to say that you wanted to do a good

15   job in your assessment of the case?

16   A.   I always try to do a good job for any case.

17   Q.   Okay.  And you wanted to be thorough in all of the

18   information that you reviewed?

19   A.   Yes, sir.

20   Q.   And you wanted to be thorough in all of the analysis that

21   you conducted, both speaking to the prosecutors and in your

22   reports?

23   A.   Yes, sir.

24   Q.   Because this is an important -- important assignment that

25   you were given?

```
 1   A.   Yes, sir.
 2   Q.   In addition to that, you're making an hourly rate, correct?
 3   A.   That didn't have anything to do with how accurate my report
 4   was.
 5   Q.   True.
 6   A.   Yes.
 7   Q.   But you are receiving payment for this today, right?
 8   A.   Yes, sir.
 9   Q.   Okay.  And in the range of $600 an hour?
10   A.   Yes, sir.
11   Q.   Okay.  So the reason that you wanted to review all of this
12   information is because you actually weren't one of the
13   physicians who treated Mr. Gallagher, right?
14   A.   I did not treat Mr. Gallagher, that's correct.
15   Q.   So you didn't treat him at Scripps Hospital?
16   A.   That's correct.
17   Q.   And you didn't perform the autopsy?
18   A.   That's correct.
19   Q.   You didn't perform the toxicology screening?
20   A.   Correct.
21   Q.   You've never previously treated Mr. Gallagher before in
22   your life?
23   A.   Not to my knowledge, but I can't guarantee that.
24   Q.   Okay.  As you sit here today, you have no reason to believe
25   that you ever treated this gentleman in the past?
```

```
1    A.   Correct.

2    Q.   And so you don't -- you didn't know anything about his

3    medical history at the time of the assignment that it was given

4    to you?

5    A.   I knew what was provided to me from the medical examiner's

6    report, where it talks about past medical -- I believe the

7    report mentioned a little about his medical history in there.

8    Q.   Okay.  So did you see that there was a notation on the

9    medical examiner's report about there being a history of

10   illicit drug use?

11   A.   I did see that.

12   Q.   And did you contact Dr. Robert Stabley at all to ask what

13   that was about?

14   A.   I did not personally contact Dr. Stabley.  I did have a

15   question at one point that I went through Mr. Wong, who talked

16   to Dr. Stabley.

17   Q.   Okay.

18   A.   But I did not directly.

19   Q.   Okay.  And just to be clear, and this may seem obvious, but

20   you weren't actually with Mr. Gallagher on February 5th, 2019?

21   A.   That's correct.  I was not.

22   Q.   So to form an accurate conclusion about his cause of death,

23   because you didn't have any relation to this gentleman in the

24   past, you needed some certain information?

25   A.   Correct.
```

1    Q.   One of those things was the medical examiner's report,

2    right?

3    A.   Yes, sir.

4    Q.   One of those was the actual records from Scripps Hospital,

5    right?

6    A.   Yes, sir.

7    Q.   Okay.  Then the toxicology report, correct?  I'm sorry,

8    sir, just for the record --

9    A.   I apologize.  Yes, sir.  Sorry.

10   Q.   That's okay.  Any evidence that you observed -- or any

11   evidence that you heard was at the scene, or that was reviewed

12   that was at the scene of the overdose?

13   A.   I didn't personally review it, but I went through what was

14   provided to me as evidence, the drug paraphernalia, and drug

15   substances.

16   Q.   And you wanted to know about that?

17   A.   Correct.

18   Q.   Okay.  And you wanted to know any eyewitness testimony of

19   anyone that might have taken drugs with Mr. Gallagher on the

20   5th?

21   A.   As much as possible, correct.

22   Q.   Right.  Because you'd like to know exactly what he took

23   when, if possible?

24   A.   And his state of -- how he was acting prior to his death.

25   Q.   Sure, okay.  So you were provided with the DEA lab reports

```
 1  from the drugs that were seized; is that right?
 2  A.  Yes, sir.
 3  Q.  You were provided with the 911 call?
 4  A.  I believe so.
 5  Q.  Dr. Stabley's report?
 6  A.  Yes, sir.
 7  Q.  The prosecution's rendition of the sequence of events?
 8  A.  Yes, sir.
 9  Q.  Agent Peters' report about his responding to
10  Mr. Gallagher's apartment?
11  A.  I believe it was redacted, so I don't know the agent's
12  name.
13  Q.  Okay.  All right.  But you saw some of the police reports?
14  A.  Correct.  It's possible that one of them wasn't redacted,
15  but most of them are redacted.  I don't recall if I saw the
16  agent's name specifically.
17  Q.  And then there were some select text messages from
18  Mr. Gallagher's phone that were shown to you?
19  A.  Yes, sir.
20  Q.  But you weren't provided with an entire download of
21  Mr. Gallagher's phone?
22  A.  I was not.
23  Q.  Okay.  You received no eyewitness accounts of what
24  Mr. Gallagher did, in terms of taking drugs on February 5th?
25  A.  That's correct.
```

1   Q.  You received no eyewitness accounts from anyone that saw

2   Mr. Gallagher take drugs on February 5th?

3   A.  To my knowledge, that's correct.

4   Q.  Okay.  And, again, you didn't reach out to speak to

5   Dr. Stabley, correct?

6   A.  That's a correct statement.

7   Q.  You didn't reach out to speak to the doctor at Scripps

8   Hospital that treated Mr. Gallagher, Dr. David J. Smith?

9   A.  I did not.

10  Q.  You didn't reach out to Dr. McIntyre, who was the chief

11  toxicology technician that signed off on the tox report?

12  A.  That's also correct.

13  Q.  You did not reach out to Mandy Marrero, the investigator

14  from the county medical examiner's office?

15  A.  That's correct.

16  Q.  Okay.  And you didn't speak to any of them before writing

17  your amended report?

18  A.  Not directly.  There was a phone call with Mr. Wong, and I

19  believe Dr. Stabley.  And I didn't communicate directly with

20  Dr. Stabley.

21  Q.  Okay.

22  A.  But I did have that phone call on or right around the time

23  of the report.  I believe it was a few days before, if I'm not

24  mistaken.

25  Q.  Okay.

```
 1   A.   Mr. Wong could perhaps share the exact date of that phone

 2   call.

 3   Q.   So you wrote in your original report in September of 2020

 4   that "there were several tablets found in Gallagher's room:

 5   Two counterfeit oxycodone 30 milligram tablets which contained

 6   fentanyl and cocaine, and two tablets with fentanyl and

 7   acetaminophen."  Do you remember writing that?

 8   A.   I do.

 9   Q.   That's not correct, is it?

10   A.   I'm sorry?

11   Q.   That's not true, is it?  Let me rephrase.  There were not

12   four tablets found in Mr. Gallagher's room, were there?

13   A.   I don't recall.  I'll have to look at the specific

14   documents that were sent to me.  I thought there was four, but

15   it's possible there was less.

16   Q.   Did you prepare in preparation for today, sir?

17   A.   I did.

18   Q.   Did you review the report that you wrote?

19   A.   I did.

20   Q.   Did you review the amended report?

21   A.   I did.

22   Q.   Would it perhaps refresh your recollection if you saw that

23   book?

24   A.   Sure.

25   Q.   Okay.
```

```
 1              MR. BINNINGER:  Permission to approach?
 2              THE WITNESS:  Thank you.
 3   BY MR. BINNINGER:
 4   Q.   That's a page from your report, correct?
 5   A.   That is.
 6   Q.   Now, there's a paragraph in the middle there that says,
 7   "several tablets were found," do you see that?
 8   A.   Correct.
 9   Q.   Okay.  Does it say that there were two tablets of fentanyl
10   and cocaine, and two tablets of -- let's see here.  Two
11   counterfeit oxycodone 30 milligram tablets, which contained
12   fentanyl and cocaine, and two tables with fentanyl and
13   acetaminophen.  Does it say that?
14   A.   It does.
15   Q.   Okay.  That's not true, is it?
16   A.   That was to my recollection, based on the information that
17   was provided to me at the time of the report.
18   Q.   Were you provided with information about additional
19   tablets?
20   A.   Everything that I was provided is listed in my report, sir.
21   Q.   Do you understand now that that, in fact, is incorrect, in
22   terms of what was found in Mr. Gallagher's room?
23   A.   I believe there were three tablets that were found, two or
24   three tablets that were found.
25   Q.   So you don't actually know how many tablets were found?
```

1  A.  I don't recall, off the top of my head, no, sir.

2  Q.  Okay.  And in your amended report, you wrote the exact same

3  thing, right?

4  A.  My amended report, I added on the additional references

5  reviewed, and that's essentially -- and then added one

6  additional sentence at the bottom.

7  Q.  So before coming to court here today, you didn't update

8  your report to make certain that it had the correct

9  information?

10  A.  I did not re-revise the report, correct.

11  Q.  Okay.

12         MR. BINNINGER:  Your Honor, can I get the document

13  back?

14         THE COURT:  Of course.

15         MR. BINNINGER:  Thank you.

16         THE COURT:  Keep your voice up, Doctor.

17         THE WITNESS:  Yes, sir.

18  BY MR. BINNINGER:

19  Q.  All right.  So if I heard your testimony correct, you have

20  two essential opinions in this case.  The first one is that

21  cocaine had nothing to do with Mr. Gallagher's cause of death?

22  A.  Correct.

23  Q.  And that's because there was only -- and I suppose I've

24  been pronouncing it wrong -- benzoylecgonine.  That's how I

25  pronounce it.  How do you pronounce benzo --

1    A.   Benzoylecgonine.

2    Q.   Is it commonly referred to as BE?

3    A.   It's abbreviated that way.

4    Q.   Okay.  So it's my understanding that you don't believe

5    cocaine had anything to do with his death, because only BE was

6    detected and not the parent compound, cocaine, right?

7    A.   That's part of my basis for my opinion.

8    Q.   Okay.  Well, that's one of the essential arguments is that

9    there's no cocaine compound found in the blood, right?

10   A.   Correct.  Along with his behavior before.

11   Q.   Right.  So let's talk about that timeline really quick,

12   because I want to talk to you about the cocaine opinion, but

13   before I do that, I need to talk to you about the timeline

14   between the day Mr. Gallagher passed away and the time the

15   blood was actually tested, okay?

16       Because nobody knew what was in his blood until it was

17   actually tested, right?

18   A.   Correct.

19   Q.   Okay.  Because on February 5th, it's not like blood was

20   drawn, and then tested immediately, correct?

21   A.   Correct.

22   Q.   Okay.  So you know that Mr. Gallagher was last seen smoking

23   a cigarette at 4 p.m. on February 5 th, correct?

24   A.   About 4 p.m., correct.

25   Q.   About 4 p.m., okay.

1        And then he's passed out at 4:45 p.m. in his room; is that

2    right?

3    A.   About that time.

4    Q.   Okay.  And from 4:45 -- excuse me, he's pronounced dead

5    at -- is it 6:45, 6:15, somewhere around --

6    A.   I believe it was 6:15.

7    Q.   6:15, okay.

8        So if I heard your testimony correctly, because as you

9    said, cocaine has a half-life of about an hour to, I think in

10   your report, you said 1.3, is that fair?

11   A.   Correct.  I was -- about an hour.

12   Q.   Right.  So from the time, assuming that Mr. Gallagher did

13   cocaine and then passed out, between the time he's found passed

14   out and the time of death, there is over an hour of time?

15   A.   Till the time he was declared dead, correct.

16   Q.   Right.  That's about an hour and a half time?

17   A.   Approximately.

18   Q.   So at that point, there is now 50 percent or less cocaine

19   in his blood, based on the logic that you have talked to us

20   about today?

21   A.   I don't know that you could exactly say that.

22   Q.   Okay.  Fair enough.  But based on your general

23   interpretation of what the cocaine half-life is, because up

24   until Mr. Gallagher's death, that cocaine was metabolizing,

25   right?

1    A.   There's a difference between when he's clinically dead and

2    when he's declared dead.  So all that time they were doing CPR

3    on him, he is functionally dead.  So even though he wasn't

4    declared dead at that point, his heart is not beating, he is

5    not breathing, he's -- for most people would refer to that as

6    dead.

7    Q.   Okay.  So you don't know exactly when he was clinically

8    dead, where the metabolism stops?

9    A.   That's correct.

10   Q.   So you don't know exactly when the metabolism stops and the

11   degradation begins?

12   A.   I could tell you that when the medics arrived on scene and

13   he was pulseless and was not breathing, he was certainly

14   clinically dead at that time.

15   Q.   Okay.

16   A.   When prior to that, that happened, I don't know.  But I

17   could tell you the time, based on the paramedic run sheets,

18   when they found him practically dead.

19   Q.   Okay.  Okay.  And at the time that he's legally pronounced

20   dead, they didn't draw his blood?

21   A.   That's correct.

22   Q.   Right?  And, in fact, they didn't draw his blood that day,

23   right?

24   A.   Correct.

25   Q.   And they drew his blood -- well, first off, do you know

1   when they drew his blood?

2   A.   It was in the documents.  I don't recall exactly.  I

3   believe it was around 16 to 18 hours later, but I don't recall

4   exactly.

5   Q.   Does it sound about right, that around 11 in the morning on

6   February 6th, that blood was drawn in the autopsy?

7   A.   That would be about 16 to 18 hours later, correct.

8   Q.   Okay.  The blood wasn't tested then, was it?

9   A.   The blood was tested later at a reference lab.

10  Q.   Do you know when the blood was tested?  Let me ask you

11  this, Doctor.  Did you know at the time that you wrote your

12  report, what time the blood was tested?

13  A.   It was February 7th.

14  Q.   Well, sir, that's actually when the blood was sent to the

15  lab.

16  A.   It was received on the lab on the 7th, correct.

17  Q.   Right.  And being received by the lab doesn't actually mean

18  that it was tested by the lab, does it?

19  A.   No, it does not.

20  Q.   So you don't know when that blood was tested?

21  A.   I don't know the exact time it was tested.

22  Q.   So you have no idea, and you didn't address that, that you

23  don't know when the blood was tested, in your original report?

24  A.   That's correct.

25  Q.   You didn't address that either in your amended report?

```
 1   A.   Correct.
 2   Q.   Okay.  So I'd like to take a step back and talk to you a
 3   little bit about cocaine.
 4        And I know that some of this, we've kind of talked about.
 5   I just want to go over it to be certain.  So you saw in the tox
 6   record that there was .08 milligrams per liter of BE in the
 7   peripheral blood, correct?
 8   A.   Correct.
 9   Q.   Okay.  So just to be on the same playing field for the
10   jury, for everyone here, that's 80 nanograms per milliliter,
11   correct?
12   A.   Correct.
13   Q.   Okay.  Now, BE only comes from cocaine?
14   A.   Correct.
15   Q.   So that means that, at some point before the blood got
16   tested, Brendan Gallagher used cocaine?
17   A.   Correct.
18   Q.   Okay.  So, again, you don't know when that is?
19   A.   I don't know the exact time that he used, that's correct.
20   Q.   Okay.  So you don't know how much cocaine he consumed on
21   February 5th?
22   A.   That's correct.
23   Q.   You don't know how potent that cocaine was?
24   A.   That's also correct.
25   Q.   Okay.  And by potency, I mean the concentration of the
```

```
 1   cocaine in the substance, right?

 2   A.   I don't know.  I could tell you he used cocaine, but I

 3   can't tell you the amount or route that it was used.

 4   Q.   Right, no, I understand -- I understand that, sir.  What

 5   I'm trying to say, though, is when I say purity, that means

 6   concentration of that drug in the substance, right?

 7   A.   That's one interpretation.

 8   Q.   Okay.  So, again, to get a hundred percent of the drug into

 9   the blood, you would have to take it intravenously, right?

10   A.   Largely, correct.

11   Q.   Okay.  But the most common ways of using cocaine are

12   insufflation and smoking cocaine, right?

13   A.   And oral.

14   Q.   Okay.  If someone insufflates, that means that they

15   essentially inhale it up their nose, right?

16   A.   Correct.

17   Q.   Okay.  And if a person inhales cocaine up their nose, they

18   have a cardiovascular response that peaks in about 8 to 12

19   minutes, is that right?

20   A.   That's about right.

21   Q.   Okay.  And it lasts about 30 minutes, is that fair?

22   A.   That's fair.

23   Q.   Okay.  So BE starts building up in the plasma of the blood

24   about 15 to 30 minutes after administering the cocaine?

25   A.   Depending on the route.
```

```
 1   Q.   And we don't know the route.

 2   A.   Correct.

 3   Q.   All right.  So now let's talk about what happens once the

 4   person dies, regardless of clinical dead, legal dead, when they

 5   are dead.  The cocaine, it degrades, right?

 6   A.   Correct.

 7   Q.   That's because the cocaine molecule, it has what's called

 8   an ester linkage, right?

 9   A.   Correct.

10   Q.   And that ester linkage will make the drug susceptible to

11   both chemical and enzymatic hydrolysis?

12   A.   Correct.

13   Q.   Hydrolysis is a fancy word for breakdown, right?

14   A.   For breaking open, correct.

15   Q.   Okay.  And so cocaine, it breaks down in normal healthy

16   blood with a pH of 7.4?

17   A.   Correct.

18   Q.   Okay.  So cocaine breaks down in vivo, right?

19   A.   Correct.

20   Q.   That means that it breaks down in the body, right?

21   A.   Yes, sir.

22   Q.   Cocaine also breaks down in vitro, right?

23   A.   Correct.

24   Q.   That means where it's breaking down in the test tube?

25   A.   Correct.
```

1   Q.   And you don't know how long that blood was in those test

2   tubes?

3   A.   I don't know the exact duration.

4   Q.   Right.  Okay.  Now, the loss of cocaine in unpreserved

5   blood can be dramatic, right?

6   A.   Correct.

7   Q.   So the speed at which the cocaine degrades depends on the

8   actual preservation tactics of the blood?

9   A.   Correct.

10  Q.   Okay.  So the amount of time that the biological sample

11  remains in conditions that are unfavorable for cocaine

12  stability, they have to be minimized, right?

13  A.   Correct.

14  Q.   Because that's how you get an accurate result about how

15  much cocaine is in someone's blood at a specific time?

16  A.   Correct.

17  Q.   Okay.  And higher temperatures and higher pH both result in

18  increased degradation?

19  A.   Correct.

20  Q.   Okay.  Now, you could take some precautions, and you can

21  add sodium --

22  A.   I'm sorry, let me clarify.

23  Q.   Sure.

24  A.   Higher -- I wouldn't say higher, I would say within a

25  therapeutic -- within a normal pH.  It's not like it lasts

 1  indefinitely if you go way too high, you start breaking down as

 2  well.  It's a sub range.

 3  Q.  I apologize.  I didn't mean to speak over you.

 4          THE COURT:  Mr. Binninger, is this a convenient time

 5  for us to take our afternoon recess?

 6          MR. BINNINGER:  Sure.  Absolutely, Your Honor.

 7          THE COURT:  Folks, we'll take a 15-minute break at

 8  this time.  We'll be in recess until 4 p.m.

 9          Please be back in your seats at 4.  Remember the

10  Court's admonitions.  We're in recess.  Doctor, you may stand

11  down.

12      (At 3:46 p.m., the jury was excused, and the following

13  proceedings were held:)

14          THE COURT:  All members of the jury are present.

15  Counsel and the defendant are present.  Dr. Levine is back on

16  the stand.

17          You may continue your cross-examination.

18          MR. BINNINGER:  Thank you, Your Honor.  May I just ask

19  one quick question just to sort of get everybody back into

20  where we were?

21  BY MR. BINNINGER:

22  Q.  I just wanted to revisit that we had just finished off that

23  the amount of time that a biological sample remains in an

24  unfavorable condition has to try and be minimized, right?

25  A.  Yes, sir.

1   Q.   Okay.  So there's a number of ways that laboratories can

2   try and do that, right?

3   A.   Yes, sir.

4   Q.   One of those ways is to add sodium fluoride to the sample,

5   correct?

6   A.   Correct.

7   Q.   Now, sodium fluoride is going to prohibit enzymatic

8   breakdown, right?

9   A.   Correct.

10  Q.   But it's not going to stop chemical hydrolysis to BE,

11  correct?

12  A.   I believe that's correct.

13  Q.   Right.  So at the time you wrote your report, you didn't

14  know what happened to Mr. Gallagher's body after it was

15  pronounced dead -- after he was pronounced dead, excuse me, in

16  terms of the storing conditions?

17  A.   At the time of the original report, but not the revised

18  report.

19  Q.   Right.  But at the time you wrote your original report in

20  connection with this case, you had no idea how the body was

21  stored?

22  A.   Correct.

23  Q.   You had no idea when the blood was drawn and tested?

24  A.   That I would disagree with.  I'm saying I know when it

25  reached the lab, so I know at a certain --

```
 1   Q.  That's true.  You did know that.  But you didn't know when

 2   it was tested?

 3   A.  That's correct.

 4   Q.  And you didn't know whether or not any sodium fluoride

 5   would be added to help prevent enzymatic hydrolysis?

 6   A.  At the time of the original report, I did not know.

 7   Q.  Okay.  And studies have shown that there is considerable

 8   variation in the stability of cocaine in postmortem samples,

 9   right?

10   A.  Correct.

11   Q.  Okay.  And it depends on the -- one of the major factors to

12   determine is the temperature at which the body is stored,

13   right?

14   A.  Correct.

15   Q.  So I asked you to review A Comprehensive Study of the

16   Stability of Cocaine and Its Metabolites by Daniel Isenschmid,

17   Barry Levine, and Yale Caplan, did you review that?

18   A.  Yes, sir.

19   Q.  Are you familiar with it?

20   A.  I am, but if you're going to ask me exact number questions,

21   I would like to re --

22   Q.  Absolutely.  So what I would like to do --

23         MR. BINNINGER:  If I may approach, Your Honor, and

24   give --

25         THE COURT:  Yeah, sure.
```

```
 1              MR. BINNINGER:  -- this gentleman a copy.  And then
 2   also I have a copy for the government.
 3   BY MR. BINNINGER:
 4   Q.  Okay.  So what I would like to focus your attention on,
 5   Doctor, is if you could please look at page 253.  There are
 6   four graphs on the left-hand side, correct?
 7   A.  Yes, sir.
 8   Q.  And the vertical axis is concentration of cocaine?
 9   A.  Correct.
10   Q.  And the X axis is time in hours?
11   A.  Correct.
12   Q.  Okay.  And these are studies of the stability of cocaine in
13   ten different postmortem blood specimens, correct?
14   A.  Correct.
15   Q.  And figure 4A refers to the degradation of cocaine in a
16   postmortem sample that is at 20 degrees -- 25 degrees
17   centigrade, correct?
18   A.  Yes, sir.
19   Q.  And then Exhibit 4C is the concentration of cocaine in a
20   postmortem sample stored at 4 degrees centigrade, correct?
21   A.  Correct.
22   Q.  And 25 degrees centigrade, that's about 75 degrees
23   Fahrenheit?
24   A.  Sounds approximately correct.
25   Q.  About room temperature.
```

```
 1              MR. BINNINGER:  Your Honor, permission to publish to

 2   the jury?

 3              THE COURT:  Sure.

 4              MR. BINNINGER:  Okay.

 5              MR. WONG:  For clarity of the record, should we mark

 6   it as an exhibit?

 7              MR. BINNINGER:  Sure, yep.

 8              THE COURT:  It doesn't need to be.

 9              Go ahead, you can show him now.

10   BY MR. BINNINGER:

11   Q.   Okay.  So I'm pointing to 4A, correct?

12   A.   Yes, sir.

13   Q.   Okay.  And if I'm seeing that correctly, that is an

14   exponentially decreasing rate, is that fair to say?

15   A.   More or less.

16   Q.   Okay.  Well, between -- between note -- between zero hours

17   and five hours, it would appear to me that the cocaine

18   concentration, which originally was 1, is now at .6.  Is that

19   correct?

20   A.   About.

21   Q.   Okay.  And then it further decreases, based on its own sort

22   of exponential decreasive curve?

23   A.   Correct.

24   Q.   Now, with regard to 4C, what we're looking at here, the

25   vertical axis, again, is the concentration of cocaine in the
```

1   postmortem blood sample, and the X axis is time in hours,

2   correct?

3   A.   Yes, sir.

4   Q.   Okay.  Now, this is actual blood stored in refrigerated

5   conditions, correct?

6   A.   Correct.

7   Q.   Now, while I will admit, it is a slower decrease than in

8   4A, it is still decreasing, correct?

9   A.   But not to zero.

10  Q.   Right.  But it's still decreasing, right?  Okay.  And it

11  stops around 80 hours, right?

12  A.   That's when they last looked at it, correct.

13  Q.   And that's approximately three and a half days?

14  A.   Correct.

15  Q.   Okay.  All right.  So to bring this full circle,

16  Mr. Gallagher is found passed out around 4:45 p.m. on February

17  5th, correct?

18  A.   Yes, sir.

19  Q.   And his -- let's go by your standard.  When he is not

20  legally pronounced dead, but actually dead.  It appears as

21  though that's about an hour, right?

22  A.   Correct.

23  Q.   So for that hour, the cocaine is metabolizing in his blood?

24  A.   For some duration of that hour.

25  Q.   And then after that, while the blood is in unpreserved

1    conditions, one could expect that it would decrease at the

2    level that we just saw under the 4A chart?

3    A.   Correct.

4    Q.   Okay.  And you had no idea when the body was actually put

5    into a refrigerator at the time that you wrote your original

6    report?

7    A.   I believe it was about five or six hours later.

8    Q.   Okay.  You did not put that in your original report, did

9    you?

10   A.   I didn't know it at the time -- I'm sorry, I didn't know it

11   at the time of the original report.  I subsequently learned

12   about six hours.

13   Q.   Right.  Okay.  And you didn't contact anyone from the

14   hospital or the morgue to find out about the conditions in

15   which the body was kept?

16   A.   I didn't.  I would imagine they used routine storage

17   methods, which is they just put the body from the hospital into

18   the morgue as well.

19   Q.   But you didn't call to find out?

20   A.   Correct.

21   Q.   Okay.  You didn't know about how the blood was stored in

22   tubes?

23   A.   I subsequently learned -- ascertained that, correct.

24   Q.   Right.  At the time that you wrote your original report,

25   you did not know that?

```
 1    A.   Correct.

 2    Q.   Okay.  And you also didn't know the pH of the blood at the

 3    time that Mr. Gallagher died?

 4    A.   Correct.

 5    Q.   And you didn't know the pH of the blood when it was drawn?

 6    A.   Correct.

 7    Q.   Okay.  And you didn't attempt to find this out by

 8    contacting Dr. McIntyre?

 9    A.   Correct.

10    Q.   Okay.  In your original report, you never addressed the

11    concept of cocaine degradation in vivo?

12    A.   That's a correct statement.

13    Q.   You never addressed the concept of cocaine breaking down in

14    vitro in your original report?

15    A.   That's correct as well.

16    Q.   And also, not in your amended report either?

17    A.   That's correct.  That's because it doesn't break down to

18    zero.

19    Q.   But to be fair, Doctor, there is absolutely no analysis or

20    assessment in your reports regarding this?

21    A.   Correct.

22    Q.   Now, you did mention in your report that in poly drug

23    induced deaths, that the range of concentration of cocaine in

24    the blood is from .2 to 17.8 milligrams per liter.  Let me

25    break that down.  Poly drug means multiple drugs, right?
```

```
 1   A.   Correct.

 2   Q.   Just like in this case?

 3   A.   Correct.

 4   Q.   And .2 milligrams per liter, which is the low end of the

 5   range, that's approximately 200 nanograms per milliliter?

 6   A.   That is correct.

 7   Q.   Okay.  All right.  You read Dr. Stabley's report, the

 8   autopsy report, right?

 9   A.   Yes, sir.

10   Q.   You saw that he noted that Mr. Gallagher's heart was 550

11   grams?

12   A.   Yes, sir.

13   Q.   Now, you sent me an article to read about the normal

14   average sizes of hearts, correct?

15   A.   I didn't send it directly to you, but I believe you got it

16   from Mr. Wong.

17   Q.   Okay.  That article was Normal Organ Weights in Men, Part

18   I, The Heart by D. Kimberly Molina, MD, and Vincent JM DiMaio,

19   MD?

20   A.   Correct.

21   Q.   Okay.  And in their study, they noted that the average

22   weight of a heart is 331 grams?

23   A.   Correct.

24   Q.   And studies have consistently shown that?

25   A.   To be clear, in their report, they also break it down into,
```

1   are they obese or not obese.  And there is -- if you look at
2   the obese heart, the obese heart is actually a lot larger.
3   Q.   Okay.  There were also a few other preconditions about
4   people that couldn't be involved in that study, too, right?
5   A.   Correct.
6   Q.   Like people with prior illicit drug use?
7   A.   I believe that was one.
8   Q.   Or anyone that might have ventricular left hypertrophy?
9   A.   Correct.
10  Q.   Like Mr. Gallagher?
11  A.   Correct.
12  Q.   Okay.  You did not address the cardiovascular issue as a
13  contributing cause in your original report, did you?
14  A.   I don't think it is.
15  Q.   You just didn't assess it?
16  A.   That's incorrect.  I assessed it.  I didn't put it in my
17  report.
18  Q.   Okay.  All right.  But you did not write about it or
19  analyze why Dr. Stabley is incorrect in saying a contributing
20  cause would be the cardiovascular disease?
21  A.   I don't think it's a but-forth cause, is what I said.
22  Q.   I understand that, sir.  I understand that you have an
23  opinion, I'm just saying, in your report, you did not assess
24  the cardiovascular disease aspect?
25  A.   I didn't -- I didn't discuss it in my report.  I did assess

```
 1  it.  I didn't discuss it.
 2  Q.  Okay.  All right.  So you saw the Scripps medical records
 3  from when Mr. Gallagher was actually taken to the hospital,
 4  right?
 5  A.  Yes, sir.
 6  Q.  And you saw that in Dr. David J. Smith's notes, he said
 7  that Mr. Gallagher was admitted due to cardiac arrest?
 8  A.  Yes, sir.
 9  Q.  And the final diagnosis was cardiac arrest?
10  A.  Yes, sir.
11  Q.  That means that the heart is stopped?
12  A.  Yes, sir.
13  Q.  Did you contact -- well, you didn't contact Dr. David
14  Smith, did you?
15  A.  I did not.
16  Q.  And ask him about that finding or that observation?
17  A.  I think it was fairly clear his heart was stopped.  He had
18  no pulse, no blood pressure, and he was asystolic.
19  Q.  Okay.  All right.  So we talked a little bit about
20  arrhythmias, and we heard that arrhythmias can happen without
21  any drug use, right?
22  A.  Correct.
23  Q.  If someone just has an enlarged heart, right?
24  A.  Correct.
25  Q.  And it can also happen -- it can be precipitated by
```

1    cocaine?

2    A.   Correct.

3    Q.   And you don't know exactly how much cocaine would have

4    caused an arrhythmia in Mr. Gallagher?

5    A.   That's a correct statement.

6    Q.   Okay.  So because you only saw select text messages from

7    Mr. Gallagher's phone, you didn't see the frequency with which

8    he was seeking out or using drugs?

9    A.   That's correct.

10   Q.   Okay.  I'd like to talk to you a little bit about the

11   fentanyl now.

12   A.   Okay.

13   Q.   We've heard a lot today about 6.1 nanograms per milliliter

14   in the blood.  And I understand that that is within the lethal

15   range.  But 6.1 nanograms per milliliter, that doesn't actually

16   tell you what was required for death, right?

17   A.   I'm sorry, please restate the question?

18   Q.   Sure.  6.1, that just tells you what was detected in the

19   blood?

20   A.   Correct.

21   Q.   But a lesser amount could have actually been what killed

22   him, and they just found 6.1 in the blood?

23   A.   Correct.

24   Q.   Okay.  So as you said in your report, in the toxicology

25   community and in literature, a given level of fentanyl, it

1   might be fatal to some, but it may not be fatal to others,

2   right?

3   A.   I think I said you have to interpret the levels in the

4   context of the clinical situation.

5   Q.   Okay.  The 6.1 nanograms per milliliter, that doesn't tell

6   you where the fentanyl came from, does it?

7   A.   It does not.

8   Q.   It does not tell you if it came from one source of fentanyl

9   or multiple sources of fentanyl, does it?

10  A.   It does not.

11  Q.   And it doesn't tell you how many times Mr. Gallagher used

12  fentanyl on February 5th?

13  A.   That's a correct statement.

14  Q.   And you noted in your report that drugs that are purchased

15  illicitly, they don't have the same manufacturing quality

16  control as prescription drugs, right?

17  A.   Correct.

18  Q.   That's because if someone buys something over the counter,

19  they receive a prescription medication for it, generally,

20  right?

21  A.   I'm sorry, I'm not sure I'm following your question on

22  that.

23  Q.   Sure.  If you -- I apologize, I misspoke.

24      If someone gets an over-the-counter drug or a drug is

25  prescribed to them from a doctor, we have a good understanding

1    of what the dosage is, right?

2    A.   As long as it's an actual drug, correct.

3    Q.   Yes.  Okay.

4    A.   The drug meaning the medication.

5    Q.   Because the drug is prepared by a pharmaceutical company,

6    right?

7    A.   Correct.

8    Q.   And that's regulated by the FDA?

9    A.   Correct.

10   Q.   So if we bought a product that contained acetaminophen or

11   Tylenol from a retail store, we can be fairly certain about how

12   much drug it contains?

13   A.   Yes, sir.

14   Q.   And we can be confident that that pill doesn't contain

15   chemicals or other dangerous drugs?

16   A.   I'm sure it does contain chemicals.

17   Q.   Dangerous drugs?

18   A.   I'm sure it does contain chemicals.

19   Q.   But we can be fairly confident it doesn't contain dangerous

20   drugs?

21   A.   It's all relative.  I'm saying it's -- the amount could

22   make something dangerous, but I think it's --

23   Q.   Fair enough.

24   A.   -- confident that it contains what it says it contains.

25   Q.   Okay.  And typically, there's a label involved or

1    instructions from a doctor that will tell the user how to take

2    the drug?

3    A.   Correct.

4    Q.   That's known as the route of administration, right?

5    A.   The route is oral or IV.  How frequently is not the route,

6    but the label usually will say other things besides the route.

7    Q.   Okay.  But how you take it is either oral, smoking it,

8    insufflation?

9    A.   Correct.

10   Q.   IV, okay.  And it would also contain the number of

11   recommended doses from the doctor or the pharmacy?

12   A.   Correct.

13   Q.   Okay.  Now, the materials that were found in this case and

14   that were tested by the DEA, to your knowledge, they were

15   manufactured clandestinely?

16   A.   That would be my understanding.

17   Q.   That means that they were manufactured privately?

18   A.   It was not from a recognized pharmaceutical company.

19   Q.   Okay.  So there was no control over the amount of fentanyl

20   that may be in a pill?

21   A.   Correct.

22   Q.   And there's no control over the amount of any other binding

23   substance that may be in those pills?

24   A.   Correct.

25   Q.   So the concept of biological equivalence, have you heard

1  this phrase before?

2  A.  Yes, sir.

3  Q.  That means that because a drug is regulated and produced by

4  a reputable manufacturer, that we can be safely confident that

5  the drugs will have similar amounts --

6          MR. WONG:  Objection.

7          THE COURT:  Let him finish the question.  Go ahead.

8  BY MR. BINNINGER:

9  Q.  That the two drugs, even though they're made from different

10  manufacturers, that they would have the same concentration of a

11  certain drug within their pills?

12          THE COURT:  What's the objection, Mr. Wong?

13          MR. WONG:  Well, it seemed like he was giving --

14          THE COURT:  No, no, a legal objection.  The basis for

15  the objection?

16          MR. WONG:  I'll withdraw it.

17          THE COURT:  All right.  Do you have his question in

18  mind?

19          THE WITNESS:  I'm sorry, can you please repeat that

20  question?

21          THE COURT:  I muddled it by trying to -- I think he's

22  asking about biological equivalence, and what that term means,

23  isn't that right?

24          MR. BINNINGER:  Yes, it is.

25          THE WITNESS:  So it should be the same from -- if it's

1    labeled as X number of milligrams, it should be the same X

2    number of milligrams, depending on which manufacturer is making

3    it.

4           THE COURT:  You can pull that as close as you can.

5    Your voice is dropping off a little at the end.

6           THE WITNESS:  It refers to if a certain drug

7    manufacturer says there's X number of milligrams in a drug, or

8    in a tablet, then a different manufacturer that's also saying X

9    number of milligrams would have the same actual amount of

10   milligrams in it.

11   BY MR. BINNINGER:

12   Q.   Okay.

13   A.   Meaning if I buy Walgreens acetaminophen versus I buy CVS's

14   acetaminophen, if they're both labeled 500 milligram tablets,

15   they're both going to have 500 milligrams in it.

16   Q.   Thank you.  There is not biological equivalence with regard

17   to pills manufactured clandestinely?

18   A.   Correct.

19   Q.   Okay.  And it is not at all clear if Mr. Gallagher

20   previously consumed fentanyl instead of oxycodone?

21          MR. WONG:  Objection, vague as to the timeframe.

22   Previously.

23          THE COURT:  Yeah, sustained.  You want to pin it down

24   to a particular time?

25   BY MR. BINNINGER:

1  Q.  Sure.  And, again, I'm happy to refer to your report, but

2  in terms of the time period from January 1st of 2019 up until

3  the day that Mr. Gallagher died, you saw text messages in that

4  timeframe, right?

5  A.  Approximately.  I don't remember the exact dates, but

6  approximately.

7  Q.  And those text messages were about acquiring blues, and on

8  one occasion, e-pills, but blues, right?

9  A.  Correct.

10 Q.  And you don't know if, in that timeframe, those blues were

11 actually fentanyl or oxycodone?

12 A.  That's correct.

13 Q.  So we don't know if any of those prior pills actually

14 contained fentanyl?

15 A.  I don't know.

16 Q.  Okay.  So all we know is based on what the lab reports show

17 us about the drugs that are manufactured clandestinely?

18 A.  And what's in his body.

19 Q.  Right, what's in his body as well.  But in terms of knowing

20 about the actual drugs, the only things that we know are based

21 on the reports that were created?

22 A.  Correct.

23 Q.  Okay.  And you reviewed the lab results, the DEA lab

24 results in this case?

25 A.  I did.

```
 1   Q.   And they provided qualitative results on which drugs were

 2   detected?

 3   A.   Correct.

 4   Q.   They did not provide quantitative results?

 5   A.   I don't recall seeing quantitative results.  I don't --

 6   Q.   Would it refresh your recollection to look --

 7   A.   Please.

 8   Q.   Okay.

 9           MR. BINNINGER:  Showing government counsel.

10           THE WITNESS:  Thank you.

11   BY MR. BINNINGER:

12   Q.   Doctor, those are two of the DEA lab results that you were

13   provided with in connection with this case, correct?

14   A.   Correct.

15   Q.   One of them is the DEA test done on the fentanyl pills that

16   were found in the Mercedes.  Well, you know what?  I retract

17   that, because it doesn't say it on there for them, but let me

18   just explain.  One of them, in fact, detects fentanyl, correct?

19   A.   It says fentanyl and acetaminophen confirmed in two units

20   of two units received.

21   Q.   Okay.  So that's one of the reports that I showed you.  The

22   other one just has fentanyl, right?

23   A.   From a plastic bag, correct.

24   Q.   There is no quantitative results showing the amount per

25   volume?
```

1    A.  Correct.

2    Q.  Okay.

3         MR. WONG:  Your Honor, for the sake of clarification,

4    since we're taking him out of order, we have no objection to

5    Mr. Binninger asking him to make assumptions.

6         THE COURT:  All right.

7    BY MR. BINNINGER:

8    Q.  So because there's no quantitative results, the exhibit

9    that had fentanyl and acetaminophen found in it, as you sit

10   here today, you have no idea of the percentage of acetaminophen

11   in those pills?

12   A.  Correct.

13   Q.  You have no idea of the percentage of fentanyl in these

14   pills?

15   A.  Correct.

16   Q.  With regard to the fentanyl that was found in the Mercedes,

17   or the three pills that detected fentanyl, you don't know the

18   quantitative results about how much fentanyl was in these

19   pills?

20   A.  Correct.

21   Q.  The last thing I would like to talk to you about is about

22   how you said that we don't know how Mr. Gallagher consumed

23   drugs on February 5th.

24   A.  Correct.

25   Q.  There wasn't any notation in Dr. Stabley's report of any

1  substances found in the nasal cavity, were there?

2  A.  I don't recall seeing any mention of it.

3  Q.  And if you had seen it, you would have made note of it,

4  right?

5  A.  If I had saw it -- if I saw it, I would have noted it,

6  correct.

7  Q.  Okay.  So we don't know whether or not he snorted fentanyl

8  or insufflated fentanyl, right?

9  A.  I don't know how he took it.  I would -- I will say the

10  lack of seeing it doesn't mean he didn't insufflate it, but I

11  have no idea what route he took it.

12  Q.  Okay.  There was a gastric specimen taken in the autopsy,

13  correct?

14  A.  I believe there was.

15  Q.  And that means that there was a piece of the stomach taken?

16  A.  Usually the stomach fluid, not the stomach wall itself.

17  Q.  Okay.  Excuse me.  But that could have been tested to

18  determine whether or not there was fentanyl in -- in those

19  fluids?

20  A.  Presumably.

21  Q.  And if so, we might have been able to have a better

22  understanding of how Mr. Gallagher consumed fentanyl?

23  A.  I would disagree.

24  Q.  Okay.  Why is that?

25  A.  You could have something called postmortem redistribution,

1   where the blood -- where the drug is crossed a little bit from

2   blood vessels out of the blood vessels, and it depends on the

3   drug.

4   Q.  Okay.

5   A.  But it can move a little bit in the body.  So if you have

6   it in the blood vessels lining the stomach, it could move a

7   small concentration into the gastric fluid itself.

8   Q.  Okay.

9   A.  So the presence of a drug in the gastric fluid doesn't

10  guarantee that it was taken that route.

11  Q.  Fair enough.  But we don't know because the gastric

12  specimen wasn't tested.

13  A.  I don't recall seeing reports of it being tested.

14  Q.  And you never contacted anyone at the medical examiner's

15  office to retest any of the specimens?

16  A.  I didn't.

17  Q.  Okay.

18         MR. BINNINGER:  I have no further questions.

19         THE COURT:  All right.  Thank you.  Any redirect?

20         MR. WONG:  Yes, Your Honor.

21                    REDIRECT EXAMINATION

22  BY MR. WONG:

23  Q.  Dr. Levine, while Mr. Binninger packs up, I'll just stand

24  over here.

25  A.  Go ahead.

```
 1   Q.  Does it make any difference, in your opinion, whether it

 2   was two tablets of fentanyl found in Mr. Gallagher's desk, or

 3   four tablets, or one tablet, or six tablets, would that change

 4   your opinion?

 5   A.  It's irrelevant.

 6   Q.  Why?

 7   A.  Because it doesn't matter how much they found.  The

 8   question is what -- we know what drug he has in his body.  And

 9   the question is what drugs are in his body, and what were the

10   levels of those drugs in his body, and what were the

11   circumstances.  It doesn't matter if he had ten tablets versus

12   one tablet.  It matters what was actually in him.

13   Q.  You were asked a number of questions about how

14   Mr. Gallagher -- Mr. Gallagher's remains were handled.  And it

15   was suggested in a number of ways that maybe the blood -- maybe

16   the metabolite -- metabolist.  Is that a word?

17   A.  Metabolism.

18   Q.  Metabolism.  Maybe it metabolized after death, either in

19   the body or in the test tube.  And I want to -- I'm just

20   highlighting that, so I can focus you on that.

21       First, when you drafted your original report, did you

22   assume that the -- the paramedics, the medical examiner used

23   normal procedures in handling the body?

24   A.  Correct.

25   Q.  And would that include putting the body in a refrigerated
```

 1   morgue at a reasonable time after death?

 2   A.   Correct.  That's a standard intervention for any hospital

 3   or medical examiner to do.

 4   Q.   And if Mr. Gallagher died at approximately 5 p.m., and was

 5   placed in the morgue at approximately midnight, would that fit

 6   your standard assumption of what was happening?

 7   A.   I'm sorry, placed in the hospital morgue or placed in

 8   the --

 9   Q.   In the medical examiner's morgue at approximately midnight.

10   A.   That would be consistent with normal patterns.

11   Q.   Okay.  And so did it -- did you have any cause to believe

12   Mr. Gallagher's case was something other than that?

13   A.   No.

14   Q.   And so that was built into your assumption, that they used

15   normal and standard procedures in your field?

16   A.   Correct.  I'm saying these are normal hospital -- it's a

17   normal hospital with a good reputation.  I think they probably

18   used standard operating procedures, although I don't know for

19   sure, but I assume they probably did.

20   Q.   Correct.  You didn't personally examine -- take the

21   temperature in the morgue at the San Diego Medical Examiner's

22   Office?

23   A.   Correct.  I did not.

24   Q.   But you are assuming that they are competent people who

25   stored the body at the appropriate temperature; is that right?

1          MR. BINNINGER:  Objection, lacks foundation.

2          THE COURT:  Yeah, that, and you're leading.

3    Sustained.

4    BY MR. WONG:

5    Q.  Okay.  You were asked why you didn't include various things

6    in your report.  And I'm asking, when you drafted your report,

7    what assumptions did you make?

8    A.  I had several assumptions.  I had that the body was

9    presumably transported to the hospital morgue.  And it was

10   actually probably stored in the hospital morgue for a while,

11   but even if not, then it was at least transported to the

12   medical examiner's morgue in a timely manner.

13       And if you're saying five or six hours, that's typical or

14   fairly common, if not fast, to make it into a medical

15   examiner's morgue.  That's one.

16       The second is that I assumed that they used

17   standard -- that the San Diego Coroner's Office, which clearly

18   has busy medical examiners, used the standardized preservatives

19   when they're looking for drug-related deaths, or any

20   toxicologic samples.

21   Q.  Okay.

22   A.  And the third assumption is -- which I didn't specifically

23   also put in there -- is that all of the -- any time you're

24   looking at postmortem drug levels, it's -- most studies,

25   including like the 112 that I mentioned, or whatever, these are

1   what's called retrospective studies, meaning they're not

2   running and taking the blood in realtime for the study.

3       They're looking back at their database of a year, or five

4   years, or ten years, or whatever time it is, to look for all

5   the fentanyl deaths and then analyzing those.  So all of those

6   people had the same general conditions that Mr. Gallagher did.

7   Q.  And thus, you based your assumptions in this case on those

8   same conditions applying?

9   A.  Correct.

10          MR. BINNINGER:  Objection, Your Honor, leading.

11          THE COURT:  Yeah, sustained.

12          MR. WONG:  Let me rephrase.

13  BY MR. WONG:

14  Q.  And how does that apply to your assumptions in this case?

15  A.  I'm assuming that they used standardized methods, and

16  therefore, the results are applicable.

17  Q.  Let's tease that out a little bit.  Do you believe it's --

18  there is a reasonable possibility that there was a material

19  change in the blood while it was in Mr. Gallagher's body

20  between the time of death and the withdrawing of the blood

21  about 18 hours later?

22  A.  No.

23  Q.  And why is that?

24  A.  Because even if you're looking at the graphs that were

25  provided by defense counsel, it doesn't go to zero.

1    I don't think that you -- for two reasons, one of which is,

2    even if you metabolized postmortem a little bit, the samples

3    are not going to zero in that time span.  And furthermore, even

4    if you did, and you said it was poorly handled, it was not

5    preserved right, and you're metabolizing the cocaine faster, as

6    was pointed out, there was sodium fluoride.  The sodium

7    fluoride was in there.  So you're ending up -- it would only be

8    going to benzoylecgonine via hydrolysis.  The benzoylecgonine

9    concentration was trivial.  So even if you broke the drug down

10   afterwards, what you're breaking it down to is barely present.

11       So I don't think this is all a matter of postmortem

12   metabolism, because what it gets metabolized to is tiny amounts

13   also.

14   Q.  Let's tease that out a little bit, and try and explain

15   that.  So you do not believe -- I just asked you about changes

16   in the blood while it was in the body.  Is it also your opinion

17   that no material change occurred in the blood after it was

18   taken out of the body and put in the test tube?

19   A.  I'm saying there's no -- I would -- no substantial changes

20   that would alter my conclusions.

21   Q.  Okay.  If I asked you to assume that it was kept in a

22   standard gray top tube, with standard preservatives, and if you

23   also assumed that the blood was stored at 4 degrees Celsius, if

24   it was withdrawn on February 6th and tested on March 19 of the

25   same year, would any of that change your analysis?

1  A.  No.

2  Q.  Do you believe there is any -- you would have to account

3  for any material change in the blood under making the

4  assumptions I just laid out?

5  A.  I'm so sorry, please repeat the question?

6  Q.  Sure.  Under those assumptions I just laid out, would you

7  want to -- do you believe it was -- it would be necessary to

8  account for changes that the blood or the test tube effected on

9  the sample stored in a standard gray top tube at 4 degrees

10  Celsius between February 6th and March 13?

11  A.  Not in this case.

12  Q.  Why is that?

13  A.  If you're asking a question, for example, did the level go

14  from 10 -- or from .1 to .9, then that may be relevant.

15      If we're asking, did the level go to zero, it's just not

16  found.  So if the storage may have had a small drop in the

17  concentration, but I don't think it's going to drop to zero.

18  And certainly, I don't think the benzoylecgonine would stay

19  that low.

20          MR. WONG:  Could we please see the toxicology report

21  again?

22  BY MR. WONG:

23  Q.  And by that low --

24          MR. WONG:  Could you enlarge the benzoylecgonine, .08

25  milligrams per liter.

1          THE WITNESS:   .08 milligrams per liter of

2    benzoylecgonine is not in a range I would expect to see in a

3    fatal case.

4    BY MR. WONG:

5    Q.   Would you -- if there was cocaine in the blood at the time

6    of death, in your opinion, is it possible that between death

7    and testing, it would have metabolized and reduced to .08

8    milligrams per liter?

9    A.   No.

10   Q.   Why is that?

11   A.   Because even if you're saying that -- I'm sorry, let me

12   clarify the question.

13        Do I think that in any fatal concentration, or do I think

14   if there's any -- even a tiniest amount of cocaine in his body?

15   Q.   A material amount in the body that would be a fatal

16   concentration?

17   A.   I think if you have enough cocaine that's going to cause a

18   fatal concentration, it's unlikely to get metabolized to zero

19   via postmortem metabolism.  And even if it did, I would expect

20   the product that it's going to, to be much higher.  The

21   benzoylecgonine is one of the products that the cocaine is

22   getting metabolized to.

23        If you're saying all of the cocaine is gone, right, it's

24   like a -- kind of like a saw.  If one of like -- the graph's

25   like with little kids.  If your level is falling down this way,

1    one of them has to go this way.  You have to -- an equal

2    amount.

3         So if you're getting rid of all of your cocaine, and that's

4    going down, then the other side is where it's going, is going

5    to have to be rising.  And where it's going is in such trivial

6    concentrations, that's not consistent with a fatal ingestion.

7    Q.  So you're saying if you have a high concentration of

8    cocaine and it all metabolizes, you would have to see a high

9    concentration -- a relatively large amount of benzoylecgonine?

10   A.  Correct.

11   Q.  But you see a relatively very small amount of

12   benzoylecgonine?

13   A.  Correct.

14   Q.  I see.  Therefore, a small amount of cocaine?

15   A.  Correct.

16   Q.  Now, isn't it true that in the studies you've done, you see

17   cocaine in blood samples in fatal concentrations -- you see

18   cocaine overdoses in blood all the time?

19   A.  Correct.

20   Q.  If, as a matter of course, cocaine metabolized and degraded

21   in test tubes or in deceased bodies, would you expect to see it

22   as a matter of course in so many samples that you see?

23   A.  I would not expect it at all.  I don't personally run the

24   cocaine metabolite -- I don't personally analyze the blood.  It

25   all gets sent to a reference lab.  And it typically would take

1    several days to be analyzed.

2        So the fact that I see the parent compound, cocaine, on a

3    fairly regular basis suggests that that's not a normal

4    occurrence to all be metabolized to zero.

5    Q.  And so that suggests that under those normal conditions,

6    normal test tubes, normal temperatures, there is no postmortem

7    metabolism of cocaine?

8    A.  I would say there's minimal.  I wouldn't say there's zero,

9    I'd say there's minimal.

10   Q.  Fair enough.  Minimal, but enough to make a difference to

11   your opinion in this case?

12   A.  No.

13           THE COURT:  It's been asked and answered, Mr. Wong.

14   BY MR. WONG:

15   Q.  You were asked about whether you could determine whether

16   Mr. Gallagher inhaled the cocaine or took it via pill form.

17   Does that make any -- does your opinion hinge on the manner of

18   him taking the cocaine?

19   A.  It doesn't.

20   Q.  Okay.  You would still say cocaine did not effect his

21   death?

22   A.  Correct.

23   Q.  Is Mr. Gallagher -- if he was -- if he had consumed a fatal

24   concentration of cocaine almost -- soon before or

25   contemporaneous with his death, is that consistent with him

1   feeling groggy or sitting down?

2   A.   It is not.

3   Q.   In fact, would you expect to see the opposite?

4   A.   I would.  As I was saying before, everything goes up.  So

5   his mental status would be up.  He would be sweaty.  He would

6   be agitated.  He may be responding to internal stimuli,

7   hallucinating, or seeing things.  You're agitated when you're

8   high on cocaine.

9       So if you're taking an amount of cocaine that's likely to

10  kill you, I would expect him to not be sitting there calmly

11  smoking a cigarette.

12  Q.   Would it change your opinion if you were asked -- you were

13  asked about prior text messages for Mr. Gallagher, and messages

14  you were or were not shown.  If I ask you to assume that

15  Mr. Gallagher consumed cocaine and other drugs on a fairly

16  regular basis in the seven to eight months leading up to his

17  death, would that change your opinion?

18  A.   It would not.

19  Q.   Why?

20  A.   Because I don't think his enlarged heart was the but-forth

21  cause of death.  I think that that might contribute -- that

22  might be the cause of his enlarged heart.  But I don't think

23  the enlarged heart was what actually killed him that day.

24  Q.   Now, you were asked about the Scripps medical records and

25  the emergency room doctor noting that he died of cardiac

1    arrest.  Does -- and Mr. Binninger asked you why you didn't

2    call the Scripps doctor, do you remember that question?

3    A.  I do remember the question.

4    Q.  Does the Scripps ER doctor's notation of cardiac arrest

5    bear any -- is that any indication of the but-for cause of his

6    death?

7    A.  Not at all.  I put that on virtually every single cause of

8    death, unless it's a super-obvious thing, like a gunshot to the

9    head.  Then I'll say, cause of death, gunshot to head.

10   Otherwise, virtually every single person I see is --

11           MR. BINNINGER:  Your Honor, objection, lacks

12   foundation as to Dr. David J. Smith.

13           THE COURT:  Overruled.  The answer may stand.  Go

14   ahead, next question.

15   BY MR. WONG:

16   Q.  I believe he was interrupted in mid-sentence.  Could he

17   finish?

18           THE COURT:  No.  No, he wasn't.  You answered that you

19   put cause of death as cardiac arrest in almost all cases,

20   unless it's an obvious different cause of death, like a gunshot

21   wound?

22           THE WITNESS:  Super-obvious.  It doesn't have to be a

23   gunshot, but I mean, unless there's some super-obvious --

24           THE COURT:  Car accident.

25           THE WITNESS:  Car accident.  Mauling by an animal.

1    Unless there's some super-obvious other reason.

2            THE COURT:  Got it.

3            THE WITNESS:  I put cardiac arrest for all causes.

4            THE COURT:  Next question, Mr. Wong.

5    BY MR. WONG:

6    Q.   Would it change -- you were asked about whether the pills

7    Mr. Gallagher was consuming were fentanyl or oxycodone in the

8    weeks prior -- the three to four weeks prior to his death.

9         Would that matter to your opinion?

10   A.   Not substantially.

11   Q.   Could you explain?

12   A.   It would still somewhat depend on the dose.  One of the key

13   tenets in toxicology is the dose makes the poison.  So meaning

14   it's the amount of the drug that you take that could be whether

15   or not you're going to get toxicity or not.  So if he is using

16   oxycodone at a recreational -- strike that.

17        If he's using oxycodone at what you would get as a typical

18   tablet, he might have a little bit of tolerance.  If he's using

19   fentanyl, that's probably, on a typical dose, going to be more

20   potent than the oxycodone.

21        So even if he had a little bit of a tolerance, he's taking

22   something that's more potent than what he was usually taking.

23   Again, I don't know the exact concentrations of what he may or

24   may not have taken before.  But even if he was using oxycodone

25   before, it might create a small tolerance, but it wouldn't

```
 1   change the fact that he suddenly died because of fentanyl on
 2   February 5th.
 3   Q.   Finally, one final question.  You were asked whether the
 4   absence of a potency indicator or a concentration indicator in
 5   the DEA lab reports could have meant that the pills were 99
 6   percent Tylenol and 1 percent fentanyl, but does the mass of
 7   the pill affect its potency?
 8              MR. BINNINGER:  Objection, lacks foundation.
 9              THE COURT:  Overruled.  Do you understand the
10   question?
11              THE WITNESS:  I'm not sure I'm following your
12   question.
13   BY MR. WONG:
14   Q.   Sure.  Do you remember when Mr. Binninger showed you the
15   DEA lab reports?
16   A.   Yes, sir.
17   Q.   And he had you note that they contained a mix of drugs.
18   And for our purposes, I'll just quote, fentanyl and
19   acetaminophen, which is Tylenol, right?
20   A.   Correct.
21   Q.   And you were asked to note that you don't know what
22   percentage of each of those they contained, correct?
23   A.   Correct.
24   Q.   So if the drugs were -- the mass of the drugs were 99
25   percent Tylenol and 1 percent fentanyl, would that have any
```

1   bearing on its toxicity?

2   A.   No, I'm saying he's still -- no, he has enough fentanyl in

3   his body to -- he has enough fentanyl in his body to be a fatal

4   ingestion.  And we have that in his body.  So it doesn't

5   matter, per se, the concentration of the pills.  I can tell you

6   this is not a Tylenol overdose death.  This is not how Tylenol

7   overdose presents.  So this is -- so the percentage doesn't

8   change.  The answer is it's enough.

9   Q.   How much fentanyl in a pill, as an expression of mass of a

10  pill, how much fentanyl is fatal?

11  A.   It would depend on the size of the person.  It would depend

12  on a couple factors, but a couple hundred micrograms would be

13  more than enough to be fatal, typically.

14  Q.   And could you help us, for those of us who are not familiar

15  with working in those terms, what is a microgram?  Could you

16  give us a real world example?

17          MR. BINNINGER:  Objection, Your Honor.

18          THE COURT:  This is beyond the scope of the cross.

19  The objection is sustained.

20          MR. WONG:  Okay.  Thank you.

21          THE COURT:  All right.  Thank you, Doctor.  You may

22  stand down.  Appreciate you accommodating us this afternoon.  I

23  know you were busy.

24    (The excerpt concluded at 4:47 p.m., August 24, 2021.)

25

COURT REPORTER'S CERTIFICATE

I, CYNTHIA R. OTT, Official Court Reporter, United States District Court, Southern District of California, do hereby certify that pursuant to 28 U.S.C. §753 the foregoing is a true, complete and correct partial transcript of the stenographically reported proceedings had in connection with the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED at San Diego, California, August 26, 2021.


_____
/s/ CYNTHIA R. OTT
CYNTHIA R. OTT, RDR, CRR